UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT PENA,<br>       Defendant. | 1:16-CR-10236-MLW |

## THE GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America submits this memorandum requesting that Robert Pena be sentenced to 50 months of imprisonment and two years of supervised release, and be ordered to pay restitution of $2,500,000.  The government also requests that the Court enter a money judgment against Mr. Pena in the same amount, per the government's pending motion and the parties' plea agreement.

## PRELIMINARY STATEMENT

The victim in this case — the Government National Mortgage Association ("Ginnie Mae") — entrusted Mr. Pena with other people's money.  Mr. Pena was the owner and manager of Mortgage Security, Inc. ("MSI"), a mortgage company and issuer of Ginnie Mae mortgage securities.  Mr. Pena was supposed to accurately account for the money that MSI received from loans backing those securities by, among other things, passing proceeds collected from loans to investors through Ginnie Mae and by paying borrowers' bills with their escrowed funds.

Instead, over many months, Mr. Pena systematically stole approximately $2,500,000 of that money, covered up his thefts each month with bogus reports, and used that money like it was his own.  He enriched himself and his business, and funded a side condominium development project.  Now, even after the condominium development project has been completed, the stolen funds and any proceeds from the project are gone, and MSI has gone out of business.  Mr. Pena

long-ago drained the bank account holding the last of the stolen proceeds, and despite paying himself hundreds of thousands in stolen proceeds, today he claims he is broke.

Ginnie Mae, due to its guarantee obligations to investors, was forced to step into the breach and backstop MSI and Mr. Pena.  As a result, the missing $2,500,000 that belonged to investors and borrowers became Ginnie Mae's loss.  It seems certain, given Mr. Pena's personal and financial circumstances, that Ginnie Mae will never be repaid.

Beyond the financial harm inflicted on Ginnie Mae, Mr. Pena victimized an institution that invested substantial resources in his success.  Long before Mr. Pena stole from Ginnie Mae, its employees trained Mr. Pena as part of an outreach effort to minority-owned issuers across the nation, and Ginnie Mae employees worked with Mr. Pena and MSI over many years.

Mr. Pena also compounded the harms caused by his crime.  After Ginnie Mae seized MSI's accounts due to irregularities, he did not assist Ginnie Mae in figuring out what really had occurred at his company or make available other MSI employees who could.  What is more, he prevented Ginnie Mae from recovering whatever remained of the stolen payoff funds by draining the bank account where he secreted the funds and, according to a witness, sought to hide $200,000 in assets around the time Ginnie Mae was uncovering his crime.

Under these circumstances, discussed further herein, the government's requested non-guidelines sentence — 50 months' imprisonment, two years' supervised release, and restitution of $2,500,000 — is a fair and appropriate sentence, and one that is sufficient but not greater than necessary to meet 18 U.S.C. § 3553(a)'s sentencing goals.

## OVERVIEW OF MR. PENA'S CONDUCT[1]

The government agrees with the facts outlined by Probation in the Presentence

Investigation Report ("PSR") and highlights the following:

**_Mr. Pena and MSI._**  Mr. Pena owned and operated MSI, a Massachusetts-based

mortgage lender regulated by the Massachusetts Division of Banks, as well as an issuer of

mortgage-backed securities for Ginnie Mae.  (*Id.*)  In addition to issuing Ginnie Mae securities,

MSI also serviced loans for other mortgage loan investors, such as the Federal National

Mortgage Association (commonly known as "Fannie Mae").

**_Ginnie Mae's Issuer Program._**  Ginnie Mae is a self-financed, wholly owned U.S.

government corporation within the Department of Housing and Urban Development that

facilitates housing in America by guaranteeing payments to investors in securities.  (PSR ¶ 8.)

The securities are backed by government-sponsored mortgage loans to low- and moderate-

income households, including loans made through the Federal Housing Administration, the

Department of Veterans Affairs' loan programs for veterans, and the U.S. Department of

Agriculture's loan programs focusing on rural development.  (*Id.*)

Under Ginnie Mae's issuer program, financial institutions, like MSI, pool loans, issue

securities to investors, and then pass through to investors, via Ginnie Mae, the principal and

interest payments collected on the loans backing the securities.  The following chart, from Ginnie

Mae's website,[2] succinctly illustrates the program, as well as the issuer's role in the program:

---

[1] The government does not believe that a hearing is necessary to resolve any factual issues
related to sentencing because the relevant and material factual issues have been stipulated to by
the parties in the plea agreement or are not disputed by the parties.

[2] https://www.ginniemae.gov/about_us/who_we_are/Pages/our_mission.aspx.



Ginnie Mae's guarantee of the timely payment of principle and interest encourages investors from around the world to purchase its securities, thereby allowing lenders to receive their capital back and make new loans to Americans.  (PSR ¶ 8.)  Without the liquidity provided by Ginnie Mae's guarantee, lenders would be forced to keep their loans on their balance sheets and would not have adequate capital to make new loans.  (*Id.*)  Thus, Ginnie Mae helps make affordable housing a reality for Americans by providing liquidity and stability in the mortgage market.  (*See id.*)

An issuer's failure to pass through funds collected on securities negatively impacts Ginnie Mae's ability to backstop its guarantee, distracts Ginnie Mae from its business responsibilities and objectives, and needlessly wastes Ginnie Mae resources and, ultimately, tax payer dollars.  Such conduct also tarnishes the reputation of Ginnie Mae's securities as safe haven assets.

***MSI's Work with Ginnie Mae.***  MSI was an approved Ginnie Mae issuer for nearly 15 years until Ginnie Mae terminated MSI upon discovering the fraud to which Mr. Pena has pleaded guilty.  (*See* Nov. 8, 2018 Ginnie Mae Letter, Ex. A.)  Over the course of MSI's tenure as an issuer, Ginnie Mae invested considerable resources in MSI and Mr. Pena as its owner.

Ginnie Mae, for example, selected MSI to participate in a pilot issuer mentoring program for minority and woman-owned mortgage banking firms.  (*Id.* at 1.)  Through that program, Ginnie Mae staff provided MSI and Mr. Pena with intensive training, including travel to MSI's office.  (*Id.*)  Ginnie Mae staff, contractors, and stakeholders dedicated considerable time, effort, and resources to MSI's success.  (*Id.*)  In particular, Mr. Paul St. Laurent III, a long-time Ginnie Mae employee who later helped uncover the fraud, spent considerable personal time and effort working with MSI and Mr. Pena as part of the training program, and for several years afterward overseeing MSI.  (*Id.*)

*Mr. Pena's Fraud.*  While Mr. Pena's fraud concerns a seemingly complex financial instrument, his fraud was straightforward.  When MSI received payoff checks from borrowers in Ginnie Mae securities — such as when a borrower refinances a loan — Mr. Pena diverted those checks to two bank accounts he controlled (one at Sovereign Bank, the other at Citizens Bank).  (PSR ¶¶ 10-13.)  Although Mr. Pena diverted a number of payoff checks, the government's indictment focused on 11 payoffs, worth approximately $2.3 million, that Mr. Pena diverted over approximately 18 months and never returned to Ginnie Mae.[3]

Mr. Pena was able to deceive Ginnie Mae during the scheme by falsifying reports and making payments on the loans.  (*Id.* ¶¶ 15-18.)  Ginnie Mae required issuers to submit monthly reports that documented, on a loan-by-loan basis, the money received by MSI.  (*Id.*)  Mr. Pena, with the assistance of MSI's bookkeeper and accountant, Gilda Andrade, masked the receipt of the payoff amounts by falsely reporting that the borrowers whose payoffs were stolen had made

---

[3] Mr. Pena diverted some payoff checks and paid those back months after receiving them.  (PSR ¶ 22.)

a regular monthly payment, instead of a payoff.  (*Id.*)  Mr. Pena also remitted to Ginnie Mae an amount equal to the monthly payment to make it appear that the report was accurate.  (*Id.*)

After stealing the payoff checks, Mr. Pena used the money as he saw fit.  He funneled some of it back into MSI, where he used it, for example, to fund MSI's operations and payroll, pay expenses on non-performing loans in its portfolio (including non-Ginnie Mae loans), and pay personal expenses, including cigars, gasoline, meals, hotels, rental cars, and trips, among other things.  (*See* PSR ¶ 21.)  Mr. Pena's objective, as he stated to Ms. Andrade, was to make it appear that the loans in Ginnie Mae's portfolio were performing better than they were, in order to convince Ginnie Mae to reinstate MSI's ability to issue new securities.  (*Id.* ¶ 23.)  Ginnie Mae had suspended MSI's ability to issue new securities because those securities were performing poorly.  (*Id.*)  According to Ms. Andrade, Mr. Pena believed that he could make the most money from issuing new securities or making new loans, rather that servicing previously issued ones.  Outside of MSI, he used the stolen funds to complete a condo development project called Falmouth Village West.  (*Id.* ¶ 22.)  Mr. Pena also directly paid himself tens, if not hundreds, of thousands of dollars by withdrawing those funds from the accounts where he secreted the checks and by cashing checks and withdrawing money from MSI's accounts after he had returned some of the stolen funds into MSI's accounts.

In addition, Mr. Pena misappropriated borrowers' escrowed funds.  MSI was supposed to hold tax and insurance payments in escrow for borrowers and make those payments when due.  (PSR ¶ 19.)  According to Ms. Andrade, MSI's escrow accounts often were short funds, and Mr. Pena directed her to use funds in these accounts to cover shortfalls.  (*Id.*)  Borrowers who, in fact, had paid their tax and insurance payments often called MSI complaining that MSI had not made their payments on their behalf.  In total, based on Ginnie Mae's audit, Mr. Pena

misappropriated $348,176.90 in escrowed funds received from borrowers for taxes and insurance payments, and $119,591.19 in funds received from borrowers for mortgage insurance premiums. (*Id.*)

Mr. Pena has submitted financial statements claiming he is, in effect, broke.  (PSR ¶¶ 102-105.)  After Ginnie Mae seized MSI's accounts, Mr. Pena drained the remaining approximately $60,000 from the Sovereign Bank account where he deposited nearly all the payoff checks by writing himself checks or to cash.  (*Id.* ¶ 24.)  In addition, according to a friend and former MSI-employee, Mr. Pena sought to hide $200,000 around the time Ginnie Mae was investigating MSI.  (*Id.*)[4]  Mr. Pena also apparently did not use any of the proceeds from the condo development project to pay back Ginnie Mae, and has never sought to repay Ginnie Mae in the more than five years since the fraud was discovered.

***The Parties' $2.5 Million Loss and Restitution Calculation.***  There is no dispute among the parties that the loss and restitution figure is $2.5 million, and the parties have stipulated to that amount in their plea agreement.  The parties calculated that figure as follows:  With the help of forensic auditors from Deloitte and after reimbursing investors and borrowers, Ginnie Mae incurred expenses of $2,839,467.56.  (PSR ¶ 27.)  This amount consisted of $2,371,699.47 for the 11 stolen payoff checks, $348,176.90 in missing borrowers' escrow funds, and $119,591.19

---

[4] Mr. Pena has objected to the Court considering this information, claiming that the friend and former MSI employee, Fred Willis, has not been truthful with the government.  The government has no information suggesting that Mr. Willis did not testify truthfully under oath about Mr. Pena's efforts to hide stolen proceeds.  Moreover, Mr. Willis's testimony is corroborated by, among other things, that Mr. Pena: (i) appears to have directly pocketed more than $200,000 of stolen proceeds, based on bank records, and therefore had the means to hide the amount described by Mr. Willis; and (ii) made off with stolen payoff funds after being discovered, and has never sought to pay Ginnie Mae back since being discovered — acts which are consistent with Mr. Pena's effort, as described by Mr. Willis, to prevent Ginnie Mae from recovering the stolen funds.

in missing mortgage insurance premiums. (*Id.*)  The parties and Ginnie Mae have agreed that

these losses were offset by (i) regular payments Mr. Pena made on the 11 loans to cover up the

fraud, and (ii) advances on delinquent loans in the Ginnie Mae securities, for which MSI was

entitled to reimbursement from Ginnie Mae. (*Id.*)  Although the exact offsetting amounts are

difficult, if not impossible, to reconstruct given the passage of time, the incomplete state of

MSI's records, and the fraud itself, the parties and Ginnie Mae agree that $2,500,000 is an

appropriate estimated loss and restitution figure. (*Id.*)  While the Court is not bound by that

agreement, the government believes the Court should accept the parties' calculation because it is

based on assessments by experienced accounting professionals that audited MSI's records and

reasonable estimates by all involved.

## APPLICATION OF THE SENTENCING GUIDELINES

*The Parties' Agreement Regarding the Sentencing Guidelines.*  Based in part on the

parties' plea agreement, the government believes that the sentencing calculation applicable to

Mr. Pena's conduct is as follows:

| | | |
|---|---|---|
| Base Offense Level | 7 | (§ 2B1.1(a)(1)) |
| Loss of $2.5 Million | +16 | (§ 2B1.1(b)(1)) |
| Jeopardizing Financial Institution | +4 | (§ 2B1.1(b)(15)(B)(i)) |
| Abuse of Trust | +2 | (§ 3B1.1(c)) |
| Acceptance of Responsibility | -3 | (§ 3E1.1(a), (b)) |

This calculation results in a Total Offense Level of 26.  Given that Mr. Pena has no criminal

history, the guidelines range should be 63 to 78 months.  Based on stipulations in the plea

agreement, the government understands that Mr. Pena agrees with the above calculation.

The two enhancements — a +4 for substantially jeopardizing a financial institution[5] and a +2 for abuse of trust — are appropriate here.  They reflect the seriousness of fraud concerning financial institutions and the ramifications of misusing funds that Ginnie Mae entrusted to Mr. Pena.  Probation also agrees that these enhancements are appropriate.  (PSR ¶¶ 36, 38).

   *Probation's Calculation.*  Probation disagrees with the above calculation in one respect. In addition to the above enhancements for abuse of trust and jeopardizing a financial institution, Probation believes the Court should also apply a +2 role enhancement for leader/organizer under U.S.S.G. § 3B1.1(c).  (PSR ¶ 39.)  The government's calculation did not include that enhancement because the scheme only involved two people (one of which was an employee following Mr. Pena's directions), and the government, to some extent, had accounted for the role difference between Mr. Pena and his co-conspirator through its charging decisions.[6]

   ***The Parties' Agreement Regarding a Non-Guidelines Sentence.***  As part of the plea agreement, the government agreed that it would not request a term of imprisonment greater than

---

[5] As of December 2011, MSI's audited financial statements, which MSI submitted to Ginnie Mae, showed that MSI had $3,271,397 million in assets, including $512,405 in cash and $965,000 in real estate.  (PSR ¶ 26.)  Pena's theft of more than $2.8 million of borrowers' funds (prior to any offsets) brought MSI near insolvency and prevented Ginnie Mae from being in a position repay money owed to investors with the money that Ginnie Mae seized from MSI's accounts.  (*Id.*)  As a result of Pena's fraud, moreover, Ginnie Mae and other government-related mortgage entities stopped doing business with MSI, which made it virtually impossible for MSI to continue doing business.  (*Id.*)

[6] The government charged Ms. Andrade with a single misdemeanor count of making a false statement to HUD, in violation of 18 U.S.C. § 1012, related to one of the 11 loans, while the government charged Mr. Pena with wire fraud for all 11 loans, as well as conspiracy.  Ms. Andrade pleaded guilty to that charge.  As a result, Ms. Andrade faced a maximum of 12 months' imprisonment.  On December 15, 2017, the Court (Magistrate Judge Dein) granted the government's motion for a downward departure pursuant to U.S.S.G. § 5K1.1 and sentenced Ms. Andrade to 12 months' probation and ordered her to pay $108,240.65 in restitution, as recommended by the government.  The restitution figure was based on the one stolen payoff check for which she was charged.

50 months, and Mr. Pena agreed not to ask for a term of imprisonment less than 24 months.

Thus, even if the Court were to calculate the guidelines as the parties suggest, the government is

nevertheless requesting a non-guidelines sentence.

## DISCUSSION

## I.    A Substantial Term of Imprisonment Is Warranted

As set forth below, consideration of the factors set forth in 18 U.S.C § 3553(a) weighs

heavily in favor of a substantial term of imprisonment.

*Nature and Seriousness of the Offense.*   From the government's perspective, the Court

should consider four points in assessing the nature and seriousness of Mr. Pena's crime.

*First,* Mr. Pena's theft was a betrayal on a number of levels.  He betrayed borrowers, who

entrusted him and MSI to handle their payments as appropriate and pay their tax and insurance

payments as required.  He betrayed investors, who expected that they would receive the money

they were due when it was paid.  Finally, he betrayed Ginnie Mae, an agency that helped train

him and had encouraged his success.  These betrayals, which are appropriately reflected in the

abuse of trust enhancement, warrant a substantial jail sentence.

*Second*, Mr. Pena's crime was particularly serious because it not only involved a

financial institution (MSI), but it caused that financial institution's ultimate demise.  Even the

failure of a small financial institution like MSI can have cascading effects.  At the time Ginnie

Mae seized MSI's accounts, MSI was servicing tens of millions of dollars in loans in Ginnie Mae

securities and likely servicing similar amounts for others, including Fannie Mae.  For example,

MSI had over 180 loans in its portfolio related to the Ginnie Mae securities alone.  After the

fraud, both Ginnie Mae and Fannie Mae spent considerable time and resources trying to

reconcile MSI's accounts, both through multi-day on-site audits and afterward with the help of

contractors and accounting experts.  Ginnie Mae then had to transfer MSI's loans to a new

servicer and identify affected borrowers and investors and make them whole.  The complexity and length of the mitigation efforts necessitated by Mr. Pena's crime underscore the need for substantial punishment for crimes that ruin financial institutions, like MSI.  The harm caused here is appropriately reflected in the +4 enhancement under the guidelines, and even under a non-guidelines sentence, should be reflected in the length of Mr. Pena's sentence.

*Third*, Mr. Pena also deserves a substantial term of imprisonment because of his conduct after his fraud was discovered.  A genuinely contrite fraudster, after having been discovered, would have admitted his wrongdoing, assisted Ginnie Mae in figuring out what went wrong and making homeowners and investors whole, and returned whatever stolen money remained or used money from other sources to make Ginnie Mae whole.  Not Mr. Pena.

While Ginnie Mae employees and contractors spent days trying to reconstruct MSI's records at MSI's offices in Falmouth, Massachusetts, Mr. Pena not only did not participate in the audit, but he stayed away from MSI's offices entirely.  In the months after, Ginnie Mae repeatedly communicated with MSI in order to gather further information, but Mr. Pena never provided information sufficient to piece together what occurred, either directly or through his attorney.  His brother, who was the point person for responding to Ginnie Mae's requests, could not sufficiently answer Ginnie Mae's questions because Mr. Pena had not shared with him how the payoffs were handled and had removed his access to MSI's servicing systems.  And while Mr. Pena's attorney contacted Ginnie Mae, he provided limited assistance to help Ginnie Mae transfer servicing of the loan portfolio.  (Ginnie Mae Ltr, Ex. A, at 2.)

As Ginnie Mae struggled to piece together the fraud, Mr. Pena drained the bank account of the stolen proceeds and made off with them, and apparently sought to hide $200,000 in cash, according to a friend and former MSI employee's testimony.  To the government's knowledge,

Mr. Pena has never sought to return a single penny of the stolen proceeds in the more than five years since his fraud.  The fact that Mr. Pena's reports that he lacks any significant assets means that he apparently squandered the tens, if not hundreds, of thousands in stolen money that he withdrew from MSI, as well as whatever money he made from the condo development project. Meanwhile, Ginnie Mae will be left holding the tab for his schemes.[7]

*Finally*, in stealing the $2.5 million — regardless of whether he put the money in his pocket or back into MSI — Mr. Pena was out to enrich himself.  He sought to pay himself with cash, profit from his condominium project, keep his business operating, pay his personal expenses, and get MSI back in the government's good graces in order to make more money issuing new securities and loans.  Mr. Pena's true objective is clearest, in the government's view, when he made off with the last of the stolen money, instead of returning it to Ginnie Mae.  That is the act of someone enriching himself, plain and simple.

**The Need to Promote Respect for the Law and to Afford Adequate Deterrence.**  The Court should also impose a substantial prison term to send important — but slightly different — messages to the financial and investment communities.  In regards to the financial community, professionals who have been entrusted with others money may be tempted to engage in similar schemes as Mr. Pena, and therefore, a substantial sentence will make clear to them, and the public at large, that this type of conduct will not be treated lightly — particularly where employees hamper recovery and mitigation efforts, as Mr. Pena did here.  A substantial term may

---

[7] By contrast, Ms. Andrade, Mr. Pena's co-conspirator, attempted to help Ginnie Mae during the initial audit by providing information and files necessary for Deloitte to begin reconstructing MSI's servicing records, and later, when first interviewed by federal agents immediately admitted the misconduct and her role in it and then met multiple times with the government to describe how the fraud occurred.  For her role and cooperation in the matter, the government filed a U.S.S.G. § 5K1.1, and Ms. Andrade received one year probation.

be particularly effective at deterring those at smaller financial institutions, like MSI, where these schemes are more easily employed due to lack of internal controls or because these small financial institutions are closely held.  In regards to the investment community, a substantial prison term will help send an important message to investors and potential investors in Ginnie Mae securities that, not only does Ginnie Mae guarantee its securities, but the government will punish those who commit crimes related to those securities to ensure that the controls over its securities are sound.  In other words, a substantial sentence may help buff out some of the tarnish on Ginnie Mae from Mr. Pena's misconduct.[8]

***

In sum, the government is seeking the non-guidelines term of 50 months' imprisonment — a substantial term of imprisonment that is sufficient but not greater than necessary under the circumstances.  Here, a strict guidelines calculation slightly overstates Mr. Pena's conduct because the loss includes some amounts that Mr. Pena appears to have used to pay legitimate expenses on *non*-Ginnie Mae loans that were not performing.  Mr. Pena's conduct was nevertheless egregious.  A 50-month term of imprisonment is a substantial jail sentence that will

---

[8] Mr. Pena's crimes have already been reported in press nationwide, including mortgage-related publications, and therefore, it is likely that Mr. Pena's sentence will also be reported.  *E.g.*, "Mortgage Servicer Defrauds Ginnie - Owner of Mortgage Security Arrested," Mortg. Daily, 2016 WLNR 25588388 (Aug. 16, 2016); "Mortgage Security Inc. Founder Charged in $3M GinnieMae Fraud," National Mortg. News, 2016 WLNR 25376628 (Aug. 16, 2016); "Founder of former Falmouth mortgage company pleads guilty to fraud," Cape Cod Times, 2017 WLNR 30577968 (Oct. 5, 2017); "Mortgage company founder admits to defrauding Ginnie Mae out of $2.5 million," Housing Wire (Oct. 5, 2017), https://www.housingwire.com/articles/41496-mortgage-company-founder-admits-to-defrauding-ginnie-mae-out-of-25-million; "Former Mortgage Executive Pleads Guilty to Fraud Charges," Nat'l Mortg. Professional (Oct. 16, 2017), https://nationalmortgageprofessional.com/news/64653/former-mortgage-executive-pleads-guilty-fraud-charges.

adequately punish Mr. Pena for that misconduct, deter others, and send a message to the public, financial professionals, and the investing community that such conduct will not be tolerated.

## II.    <u>Restitution and Forfeiture</u>

The Court is required to enter restitution pursuant to 18 U.S.C. § 3663A.  The government asks that the Court enter restitution in the amount of $2.5 million for the benefit of Ginnie Mae.  As discussed above, this amount has been agreed-upon by the parties and Ginnie Mae.

The Court should also order forfeiture, which the government charged in its indictment. As part of the plea agreement, Mr. Pena stipulated to the entry of a money judgment in the amount of $2.5 million.  The government requests that the Court grant its pending motion for entry of that money judgment [Dkt. No. 90].  In addition, because the Court also ordered Ms. Andrade to pay restitution in the amount of $108,240.65, the government requests that the judgment reflect that the restitution amount is joint and several up to $108,240.65 as to Ms. Andrade.

<u>CONCLUSION</u>

For these reasons, the government asks the Court to sentence Mr. Pena to 50 months' imprisonment and two years' supervised release, and order restitution and forfeiture in the amount of $2,500,000.

Dated:  December 19, 2018

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:   /s/ Brian M. LaMacchia
Brian M. LaMacchia (BBO No. 664369)
Assistant U.S. Attorney
United States Courthouse
One Courthouse Way, Suite 9200
Boston, MA  02210
(617) 748-3126
brian.lamacchia@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to counsel of record who are registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  December 19, 2018

By:   /s/ Brian M. LaMacchia
BRIAN M. LAMACCHIA
Assistant U.S. Attorney