UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. No. 16-10236-MLW |
| ) | |
| ROBERT PENA, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

### Defendant Robert Pena's Emergency Motion for
### Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A)(i)

Defendant Robert Pena respectfully moves the Court for an order directing the

remainder of his sentence to be served in home confinement and that he be immediately

released based on "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i).[1]

---

[1]      Arguably, 18 U.S.C. § 3582(c)(1)(A) only provides the Court with the authority to reduce the <u>length</u> of Pena's sentence, but does not empower the Court to order his sentence to be served in home confinement. *See* 18 U.S.C. § 3582(c)(1)(A) (providing that court "may reduce the term of imprisonment"). Such an interpretation should not stand in the way of granting Pena relief. The Court could achieve the same result by, for example, reducing Pena's sentence to time served and making home confinement a condition of his supervised release. *E.g.*, *United States v. Zukerman*, S.D.N.Y. No. 16-CR-194 (Apr. 3, 2020) ("For the reasons stated below, Zukerman's motion is GRANTED only to the extent that his sentence is modified such that his remaining term of imprisonment is replaced by an equal period of home incarceration."); *United States v. Williams*, N.D. Fla. No. 3:04-CR-95 (Apr. 1, 2020) (ECF # 91) (reducing life sentence to time served after 15 years of incarceration and including 12 months of home confinement as a condition of supervised release); *United States v. Brannan*, S.D. Tex. No. 4:15-CR-80 (Apr. 2, 2020) (ECF # 285 and 286) (reducing three-year sentence to time served after nine months of incarceration and including 12 months of home confinement as a condition of supervised release); *United States v. Ghorbani*, D.D.C. No. 18-255 (Apr. 3, 2020) (ECF # 129) (reducing 30-month sentence to time served and including 10 months of home confinement as a condition of supervised release).

As the Court is well aware, the COVID-19 pandemic has radically altered every facet of life in the United States. While every person is at risk, as a 70-year-old black man with numerous health issues, Pena faces an even greater risk of serious illness and death if he contracts COVID-19. And while most Americans can try to protect themselves—confining themselves to their homes, distancing themselves from others (and wearing masks and gloves) when they venture out—Pena cannot. As an inmate in the camp at FMC Devens, Pena sleeps within just a few feet of other inmates, shares common toilets and showers with other inmates, and eats his meals in a small dining facility with other inmates. At the same time, FMC Devens staff leave and return to the facility every day—continually increasing the risk of a COVID-19 outbreak. As this Court has recognized, "being in jail increases risk" because "[s]ocial distancing is difficult or impossible" in a prison setting.[2]  While there is not yet a confirmed case of COVID-19 at FMC Devens, experience teaches that both that (a) it is only a matter time before COVID-19 emerges at FMC Devens, and (b) when it does, it will spread too fast to be contained.

To date, Pena has been incarcerated at FMC Devens for six months, where he has been a model prisoner. This case, which involved wire fraud, is Pena's only conviction. Pena is not a threat to the community and presents no risk of flight. If placed on home confinement, Pena would return to his home in East Falmouth to live with his wife of 32 years, who just days ago, lost her father to COVID-19.

---

[2]   *Calderon Jimenez v. Cronen*, D. Mass. No. 18-CV-10225-MLW (Mar. 26, 2020) (ECF # 507-1 at 4).

## Background[3]

We are in the midst of an unprecedented global pandemic. As of the filing of this motion, there have been over 2.56 million COVID-19 cases worldwide, including over 177,000 deaths.[4]  In the United States, the Centers for Disease Control ("CDC") reports more than 775,000 cases and nearly than 42,000 deaths.[5]  In Massachusetts alone, there are more than 41,000 COVID-19 cases and 1,961 deaths.[6]

As a 70-year-old black man, Pena is particularly vulnerable—even without taking his specific health issues into account. First, there is Pena's age. According to the CDC, older adults—meaning those 65 years old and older—face a substantially higher risk: 80% of U.S. COVID-19 deaths have been adults 65 and over. The CDC estimates that, if infected, a person between 65 and 84 years old faces a 31-59% chance of hospitalization, an 11-31% chance of admission to an intensive-care unit, and a 4-11% chance of death.[7]

Next, there is Pena's race. While many jurisdictions do not report COVID-19 cases and deaths by race, the ones that do show an alarming pattern: COVID-19

---

[3]     All Internet sources cited in this motion were visited just prior to filing.

[4]     https://coronavirus.jhu.edu/map.html

[5]     https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

[6]     https://www.mass.gov/doc/covid-19-dashboard-april-21-2020/download

[7]     https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html

"appears to be infecting and killing black Americans at a disproportionately high rate."[8] Indeed, according to the Washington Post, "counties that are majority-black have three times the rate of infections and almost six times the rate of deaths as counties where white residents are in the majority," and in many areas the percentage of African-American deaths resulting from COVID-19 far exceeds the percentage of African-Americans in the population:[9]



In short, simply by being 70 years old and black, Pena faces a substantially elevated risk.

Unfortunately for Pena, he also has additional risk factors. According to the CDC, people face higher risk for severe illness from COVID-19 if they, among other

---

[8]      https://www.washingtonpost.com/nation/2020/04/07/coronavirus-is-infecting-killing-black-americans-an-alarmingly-high-rate-post-analysis-shows/?arc404=true

[9]      https://www.washingtonpost.com/nation/2020/04/07/coronavirus-is-infecting-killing-black-americans-an-alarmingly-high-rate-post-analysis-shows/?arc404=true

things, (a) are immunocompromised by the prolonged used of corticosteroids, (b) have

severe obesity, defined as a body mass index ("BMI") of 40 or higher, (c) have diabetes,

and (d) have chronic kidney disease.[10]   As Pena describes in his declaration,[11]  he (a) has

a long history of cortisone injections, (b) his BMI is approximately 38.5,[12]  (c) he has

been diagnosed as pre-diabetic, and (d) he has been told his kidneys are

compromised.[13]

      Given the acute risks that Pena faces, it is imperative he comply with CDC

recommendations for avoiding infection, the most prominent of which is social

distancing.[14]  Importantly, social distancing is crucial even among people with no

symptoms of COVID-19 because asymptomatic people can transmit the virus to

---

[10]    https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html

[11]    Exhibit 1, ¶ 2.

[12]

    https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (BMI of 38.5 calculated using height of 6 feet, 2 inches tall and weight of 300 pounds).

[13]    Aside from these risk factors specifically identified by the CDC, Pena faces a host of other health issues—many of which were previously documented in the presentence report and in motions filed while he was awaiting sentencing or incarceration. *See* PSR, ¶¶ 81-87, ECF # 101, 138, 153, 166. A nonexhaustive list includes numerous knee surgeries, frequent migraine headaches, arthritis, spinal stenosis, and a recent total hip replacement.

[14]    https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (describing social distancing as "a cornerstone of reducing transmission of respiratory diseases such as COVID-19").

others.[15]  But as this Court has recognized, "being in a jail enhances risk" because "[s]ocial distancing is difficult or impossible" in a prison setting.[16]  In the weeks since the Court made those statements, its observations have proved prescient. The spread of COVID-19 within the Bureau of Prisons ("BOP") has far outpaced the rest of the country and the rate of infection within BOP is nearly double the rest of the country:[17]

| Day of Known COVID-19 Case | BOP Date | BOP Infections | U.S. Date | U.S. Infections |
|---|---|---|---|---|
| Day 1 | 3/20/2020 | 2 | 1/22/2020 | 1 |
| Day 2 | 3/21/2020 | 3 | 1/23/2020 | 1 |
| Day 4 | 3/23/2020 | 6 | 1/25/2020 | 2 |
| Day 5 | 3/24/2020 | 9 | 1/26/2020 | 5 |
| Day 7 | 3/26/2020 | 18 | 1/28/2020 | 5 |
| Day 8 | 3/27/2020 | 27 | 1/29/2020 | 5 |
| Day 10 | 3/29/2020 | 38 | 1/31/2020 | 7 |
| Day 11 | 3/30/2020 | 52 | 2/1/2020 | 8 |
| Day 12 | 3/31/2020 | 59 | 2/2/2020 | 8 |
| Day 13 | 4/1/2020 | 94 | 2/3/2020 | 11 |
| Day 14 | 4/2/2020 | 114 | 2/4/2020 | 11 |
| Day 15 | 4/3/2020 | 141 | 2/5/2020 | 11 |
| Day 16 | 4/4/2020 | 174 | 2/6/2020 | 11 |
| Day 17 | 4/5/2020 | 197 | 2/7/2020 | 11 |
| Day 18 | 4/6/2020 | 259 | 2/8/2020 | 11 |
| Day 19 | 4/7/2020 | 313 | 2/9/2020 | 11 |
| Day 20 | 4/8/2020 | 377 | 2/10/2020 | 11 |
| Day 21 | 4/9/2020 | 408 | 2/11/2020 | 12 |
| Day 22 | 4/10/2020 | 481 | 2/12/2020 | 12 |
| Day 23 | 4/11/2020 | 520 | 2/13/2020 | 13 |
| Day 24 | 4/12/2020 | 541 | 2/14/2020 | 13 |
| Day 25 | 4/13/2020 | 589 | 2/15/2020 | 13 |
| Day 26 | 4/14/2020 | 694 | 2/16/2020 | 13 |
| Day 27 | 4/15/2020 | 731 | 2/17/2020 | 13 |
| Day 28 | 4/16/2020 | 752 | 2/18/2020 | 13 |
| Day 29 | 4/17/2020 | 761 | 2/19/2020 | 13 |
| Day 30 | 4/18/2020 | 784 | 2/20/2020 | 13 |
| Day 31 | 4/19/2020 | 804 | 2/21/2020 | 15 |
| Day 32 | 4/20/2020 | 816 | 2/22/2020 | 15 |



COVID-19 Infections per 1,000 People
Bureau of Prisons   United States   China   Italy
4.54   2.38   0.06   2.90
Infections/ 1,000 People

---

[15]     https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html

[16]     *Calderon Jimenez v. Cronen*, D. Mass. No. 18-CV-10225-MLW (Mar. 26, 2020) (ECF # 507-1 at 4).

[17]     https://federaldefendersny.org/assets/uploads/BOP_Compared_to_U.S.4.20.pdf and https://federaldefendersny.org/assets/uploads/Rate_of_Infections.4.20.pdf These charts were created by the Federal Defenders of New York based on CDC and BOP data.

BOP reports that as of April 21, 2020, there are 863 BOP cases (540 inmates and 323 staff), including 23 inmate deaths.[18]  Importantly, these figures do not tell the full story. As the BOP website notes, these figures include <u>only</u> "confirmed lab results"; Pena is unaware of any public figures of how many BOP inmates are suspected of having COVID-19 or are quarantined. In addition, BOP's cases of COVID-19 are not spread evenly throughout its facilities; rather, nearly two-thirds of BOP cases are in just eight facilities.[19]  The lesson is clear: once COVID-19 enters a facility, it will spread quickly— as recent examples in Arkansas[20] and Ohio[21] chillingly illustrate.

While FMC Devens does not yet have a confirmed case of COVID-19, that fact is not surprising given that as of April 7, only 17 out of 1028 inmates (less than 1.7%) had been tested.[22]  Meanwhile, BOP has acknowledged that inmates at the medical center at

---

[18]     https://www.bop.gov/coronavirus/

[19]     https://www.bop.gov/coronavirus/ (as of April 21, listing 98 total cases at Elkton FCI, 90 total cases at Lompoc USP, 81 total cases at Milan FCI, 71 cases at Yazoo City Low, 61 total cases at Terminal Island FCI, 51 total cases at Danbury FCI, 46 Butner Medium FC,I and 45 total cases at Oakdale FCI, totaling 543 cases out of 863 cases nationwide)

[20]     https://www.ualrpublicradio.org/post/arkansas-reports-30-coronavirus-deaths-cases-surge-prisons (describing how after the state's first inmate tested positive, 43 out of the other 46 inmates housed in the same barracks also tested positive)

[21]     https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus (describing that an Ohio prison that tested <u>all</u> inmates—not just those showing symptoms) revealed that 73% of inmates had been infected)

[22]     *See* Letter from United States Attorney for Eastern District of Pennsylvania filed in *United States v. Turner*, E.D. Pa. No. 17-132 (Apr. 8, 2020) (ECF # 44 at 1).

FMC Devens have experienced symptoms like cough, shortness of breath, and fever.[23] As is obvious (and as Pena describes in his declaration[24]) a large institution like FMC Devens cannot stand in isolation: staff come and go every day, supplies must continuously be delivered, and contraband continually finds its way into the facility. The arrival of COVID-19—if it has not arrived already—is virtually inevitable. And when COVID-19 does arrive, it will spread quickly given the conditions there.

As Pena describes in his declaration,[25]  the camp at FMC Devens houses over 100 inmates who all sleep in the same space.[26]  The inmates are divided by doorless, roofless cubicles approximately six feet by nine feet, and about six feet high. Each cubicle has a two-person bunk bed. While Pena is the only inmate in his cubicle, because of the way the cubicles are arranged, he sleeps literally just a few feet away from approximately eight to ten other inmates.

The camp inmates share 12 toilets, 12 sinks, and 12 showers, which are cleaned by inmates just twice daily, with no assurance they are properly disinfected. Similarly, the inmates share four telephones and five computers, which are not cleaned between users. For meals, the inmates stand in line together and eat at communal tables.

---

[23]     *Id* at 1-2.

[24]     Exhibit 1, ¶ 3.

[25]     Exhibit 1, ¶ 3.

[26]     As of April 21, 2020, the BOP website listed 108 inmates at the camp. https://www.bop.gov/locations/institutions/dev/

Camp inmates work in different areas of the camp and outside the camp in other buildings and areas of FMC Devens. Pena works as an orderly in the camp, bringing him within close proximity of officers and staff who come and go from FMC Devens every day.

Soap is available for purchase, but sometimes run out; Pena recently went several days without soap. Approximately three weeks ago, Pena received three "flimsy" masks; on April 15, he received three more. In other words, the camp inmates are provided approximately one "flimsy" mask per week.

## Argument

Under 18 U.S.C. § 3582(c)(1)(A)(i), a sentencing court court may "reduce [a] term of imprisonment . . . after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that" (a) "extraordinary and compelling reasons warrant such a reduction," and (b) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." As described below, a reduction in Pena's sentence is warranted based on the COVID-19 pandemic and the the inability of Pena—who faces increased risk—to take appropriate measures to protect himself given the conditions at FMC Devens. In addition, as also described below, while 18 U.S.C. § 3582(c)(1)(A) sometimes requires prisoners to wait before seeking relief from the Court, the Court can—as numerous other courts have—address the merits of Pena's motion now because of the urgent risk that Pena will contract a fatal infection.

**I.      Extraordinary and compelling reasons warrant a reduction of Pena's sentence, and a reduction is consistent with the Sentencing Commissions's applicable policy statements.**

Congress did not define the term "extraordinary and compelling reasons" in § 3582(c)(1)(A)(i), and while the Sentencing Commission has listed several specific examples of "extraordinary and compelling reasons," it also included a catch-all provision for circumstances the Commission might not anticipate—such as, for example, a global pandemic to which a person is particulary vulnerable.[27]  Indeed, it is difficult to imagine more "extraordinary and compelling reasons" than the ones Pena presents. Notably, numerous other courts across the country have already reduced sentences in light of COVID-19, including some in cases involving defendants less vulnerable than Pena.[28]

To be sure, Pena was sentenced to 32 months of incarceration and has served only six months to date. But Pena respectfully submits that the Court may well have imposed a different sentence had it known at sentencing what the world would look in

---

[27]     U.S.S.G. § 1B1.13 Application Note 1 (listing several medical conditions or family circumstances)

[28]     *United States v. Resnick*, S.D.N.Y. No. 14-CR-810 (Apr. 2, 2020) (ECF # 461) (releasing from FMC Devens defendant who had served three years and nine months of six-year sentence); *United States v. Rodriguez*, E.D. Pa. No. 2:03-CR-00271 (releasing defendant subject to 20-year mandatory minimum sentence after serving 17 years); *United States v. Perez*, S.D.N.Y. No. 17-CR-513 (Apr. 1, 2020) (ECF # 98); *United States v. Jepsen*, D. Conn. 19-CV-00073 (Apr. 1, 2020) (ECF # 41); *United States v. Colvin*, No. 3:19CR179 (Apr. 2, 2020) (ECF # 38); *United States v. Foster*, M.D. Pa. No. 1:14-324 (Apr. 3, 2020) (ECF # 191). This list is far from exhaustive and the list of compassionate releases is growing daily, some of which are listed at https://www.fd.org/coronavirus-disease-2019-covid-19/compassionate-release

April 2020.[29]  In any event, BOP anticipates Pena's release date is just 21 months from

now (January 26, 2022),[30]  he has been informed his pre-release custody date is just 15

months from now (July 29, 2021),[31]  and under a provision the First Step Act, 34 U.S.C.

§ 60541, he could become eligible for release after serving just two-thirds of his

sentence. Moreover, during the time Pena has been incarcerated, he has been a model

prisoner.[32]  To be clear, Pena is not requesting that his liberty be restored, merely that he

be underlined confined to his home (rather than a prison facility) where he is far less likely to

contract a fatal disease.[33]  Notably, other courts have granted compassionate release to

defendants with even more time remaining on their sentences.[34]  And while perhaps not

---

[29]     *United States v. Zukerman*, S.D.N.Y. No. 16-CR-194 (Apr. 3, 2020) (ECF # 116)
("The severity of Zukerman's conduct remains unchanged. What has changed,
however, is the environment where Zukerman is serving his sentence. When the Court
sentenced Zukerman, the Court did not intend for that sentence to 'include a great and
unforeseen risk of severe illness or death' brought on by a global pandemic"); *United
States v. Edwards*, W.D. Va. No. 6:17-cr-3-NKM (Apr. 2, 2020) (ECF # 134) (granting
compassionate release; "[h]ad the Court known when it sentenced Defendant in 2018
that the final 18 months of his term in federal prison would expose him to a heightened
and substantial risk presented by the COVID-19 pandemic on account of Defendant's
compromised immune system, the Court would not have sentenced him to the latter 18
months").

[30]     https://www.bop.gov/inmateloc/ (using the Register Number 99739-038).

[31]     Exhibit 1, ¶ 4.

[32]     Exhibit 1, ¶ 5.

[33]     Exhibit 1, ¶ 6.

[34]     *United States v. Zukerman*, S.D.N.Y. No. 16-CR-194 (Apr. 3, 2020) (releasing
defendant serving 70-month sentence scheduled to be released in July 2022); *United
States v. Muniz*, S.D. Tex. No. 09-CR-0199 (Mar. 30, 2020) (ECF # 578) (releasing
defendant sentence to 15 ½ years who had been only been incarcerated for less than 11
years); *United States v. Williams*, N.D. Fla. No. 3:04-CR-95 (Apr. 1, 2020) (ECF # 91)
(releasing defendant sentenced to life imprisonment for armed bank robbery after 15
years of incarceration); *United States v. Brannan*, S.D. Tex. No. 4:15-CR-80 (Apr. 2, 2020)

directly relevant from a legal standpoint, it should not go unmentioned that Pena's wife

fears for Pena's safety, especially after having already lost her father to COVID-19.[35]

**II.    The Court can excuse the 30-day waiting period under 18 U.S.C. § 3582(c)(1)(A) because of Pena's risk of fatal infection.**

Pena submitted a request for compassionate release at FMC Devens on April 8,

2020—13 days before this motion.[36]  Under 18 U.S.C. § 3582(c)(1)(A), Pena would

usually be required to wait to seek relief from the Court until either 30 days after he

submitted his request to FMC Devens, or BOP denied his request and he exhausted his

administrative appeal rights, whichever is earlier. Pena is aware that the Court recently

denied a motion based on these grounds in *United States v. Muniz*,[37] but respectfully

requests that the Court reconsider its analysis on the issue.

Like this Court in *Muniz*, many courts addressing 18 U.S.C. § 3582(c)(1)(A) have

characterized whether to entertain a compassionate-release motion as an exhaustion

issue. But § 3582(c)(1)(A) does not actually operate as an exhaustion requirement.

Typically, exhaustion means first seeking relief from an administrative agency

before seeking judicial relief. Such a requirement "serves the twin purposes of

protecting administrative agency authority and promoting judical efficiency."[38]

---

(ECF # 285 and 286) (releasing defendant who had served nine months of 36-month sentence).

[35]    Exhibit 1, ¶ 7.

[36]    Exhibit 1, ¶ 8 and Exhibit 2.

[37]    *United States v. Muniz*, D. Mass. No. 16-CR-10170-MLW (Apr. 16, 2020) (citing *United States v. Lugo*, No. 2:19-cr-00056-JAW, 2020 WL 1821010 (D. Me. Apr. 10, 2020).

[38]    *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992).

Exhaustion preserves agency authority because "agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer" and gives an agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court."[39]  Exhaustion promotes judicial efficiency because "[w]hen an agency has the opportunity to correct its own errors, a judicial controversy may well be mooted" and "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration."[40]

Here, because the relief Pena seeks from the Court (a reduction in his sentence) differs from what Pena has requested from BOP (that BOP file a motion seeking a reduction in his sentence), failing to consider Pena's motion now does not serve either purpose of exhaustion. It does not preserve agency authority because Pena is not asking the Court to do something "that Congress has charged [BOP] to administer" to or to "correct [BOP's] own mistakes." Under § 3582(c)(1)(A), <u>only</u> the Court (not BOP) can reduce Pena's sentence.[41]  Likewise, declining to consider Pena's motion does not promote judicial efficiency: the Court will ultimately have to rule on a motion under § 3582(c)(1)(A); the only difference will be who files the motion (Pena or BOP) and when (now or 17 days from now).[42]

---

[39]     *Id.*

[40]     *Id.*

[41]     *See United States v. Guzman Soto*, D. Mass. No. 18-CR-10086-IT (Apr. 17, 2020) (ECF # 48 at 9).

[42]     *Id.*

Even if § 3582(c)(1)(A) did impose an actual exhaustion requirement (it does not), a failure to exhaust can be excused unless the provision at issue is jurisdictional.[43]  As the Supreme Court has made clear in its most recent pronouncements on this kind of issue, because of the "harsh consequences" that follow, there is a "high bar" to establish that a rule should be treated as jurisdictional.[44]  A clear statement is required:

> In recent years, we have repeatedly held that procedural rules, including time bars, cabin a court's power only if Congress has "clearly stated" as much. "Absent such a clear statement, 'courts should treat the restriction as nonjurisdictional.'" But traditional tools of statutory construction must plainly show that Congress imbued a procedural bar with jurisdictional consequences.

> And in applying that clear statement rule, we have made plain that most time bars are nonjurisdictional. Time and again, we have described filing deadlines as "quintessential claim-processing rules," which "seek to promote the orderly progress of litigation," but do not deprive a court of authority to hear a case. That is so, contrary to the dissent's suggestion, even when the time limit is important (most are) and even when it is framed in mandatory terms (again, most are); indeed, that is so "however emphatically" expressed those terms may be. Congress must do something special, beyond setting an exception-free deadline, to tag a statute of limitations as jurisdictional and so prohibit a court from tolling it.[45]

There is no such clear statement in § 3582(c)(1)(A). And given that the government has assented to a compassionate-release motion in this district without a defendant first "exhausting," the government apparently agrees that the rule in § 3582(c)(1)(A) is not jurisdictional.[46]  Because § 3582(c)(1)(A) is not jurisdictional, even if it did impose an

---

[43]   *E.g.*, *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019).

[44]   *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1632 (2015).

[45]   *Id.* (citations omitted and alterations removed); *accord*

[46]   *United States v. Sanderson*, D. Mass. No. 14-1068-FDS (Apr. 3, 2020) (ECF # 214) (defendant's motion indicating government's assent).

actual exhaustion requirement, a failure to exhaust can be excused in appropriate

circumstances.

Exhaustion can be excused where it would be futile or where it would cause

undue prejudice.[47]  Here, as numerous other courts have recognized, both of these

circumstances are present here:

> Undue delay, if it in fact results in catastrophic health consequences, could
> make exhaustion futile. Moreover, the relief the agency might provide
> could, because of undue delay, become inadequate. Finally, and obviously,
> [Pena] could be unduly prejudiced by such delay.[48]

In short, § 3582(c)(1)(A) is not jurisdictional, it does not actually require exhaustion, and

even if it did, exhaustion can be excused given the circumstances.

To be sure, § 3582(c)(1)(A) does express a preference for allowing BOP to

determine whether to move for compassionate release before a defendant files a motion

himself. Such a policy may make sense under normal circumstances. But these are not

normal circumstances. Right now, 30 days is an eternity: 30 days ago (on March 22)

---

[47]     *Washington*, 925 F.3d at 118-19.

[48]     *United States v. Zukerman*, S.D.N.Y. No. 16-CR-194 (Apr. 3, 2020) (ECF # 116)
(quoting *Washington*, 925 F.3d at 118-19); *see also, e.g., United States v. Perez*, S.D.N.Y. No.
17-CR-513 (Apr. 1, 2020) (ECF # 98) ("Here, even a few weeks' delay carries the risk of
catastrophic health consequences for Perez. The Court concludes that requiring him to
exhaust administrative remedies, given his unique circumstances and the exigency of a
rapidly advancing pandemic, would result in undue prejudice and render exhaustion of
the full BOP administrative process both futile and inadequate."); *United States v.
Brannan*, S.D. Tex. No. 4:15-CR-80 (Apr. 2, 2020) (ECF # 285 and 286) (Brannan's efforts
to exhaust his administrative remedies have been fruitless. . . . he cannot wait any
longer to seek compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i)."); *United States
v. Colvin*, D. Conn. No. 3:19CR179 (Apr. 2, 2020)( Thus, in light of the urgency of
Defendant's request, the likelihood that she cannot exhaust her administrative appeals
during her remaining eleven days of imprisonment, and the potential for serious health
consequences, the Court waives the exhaustion requirement of Section 3582(c)(1)(A).")

Massachusetts had just 646 COVID-19 cases and only five deaths.[49]  As noted,

Massachusetts now has over 41,000 COVID-19 cases and 1,961 deaths. Forcing Pena to

wait until May 8 to seek judicial relief could cause irreparable harm—a fact that

numerous courts have acknowledged,[50]  including several in this district,[51]  and which

this Court has recognized in analogous circumstances.[52]

---

[49]    https://www.mass.gov/doc/covid-19-cases-in-massachusetts-as-of-march-22-2020/download

[50]    *See United States v. Guzman Soto*, D. Mass. No. 18-CR-10086-IT (Apr. 17, 2020)
(ECF # 48 at 8 n.5) (citing cases); *see also, e.g., United States v. Zukerman*, S.D.N.Y. No. 16-
CR-194 (Apr. 3, 2020) ("In [this] case, however, administrative exhaustion would defeat,
not further, the policies underlying § 3582(c)."); *United States v. Perez*, S.D.N.Y. No. 17-
CR-513 (Apr. 1, 2020) (ECF # 98) ("Here, even a few weeks' delay carries the risk of
catastrophic health consequences for Perez. The Court concludes that requiring him to
exhaust administrative remedies, given his unique circumstances and the exigency of a
rapidly advancing pandemic, would result in undue prejudice and render exhaustion of
the full BOP administrative process both futile and inadequate."); *United States v.
Brannan*, S.D. Tex. No. 4:15-CR-80 (Apr. 2, 2020) (ECF # 285 and 286) (Brannan's efforts
to exhaust his administrative remedies have been fruitless. . . . he cannot wait any
longer to seek compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i)."). Again, this
list is not exhaustive and continues to grow.

[51]    *United States v. Guzman Soto*, D. Mass. No. 18-CR-10086-IT (Apr. 17, 2020) (ECF #
48 at ) (considering merits of compassionate-release motion because § 3582(c)(1)(A) is
not jurisdictional, does not require exhaustion and "nothing in the statutory scheme
suggests that Congress intended to preclude the court from exercising judicial
discretion and to take into account timeliness and exigent circumstances related to why
the defendant seeks compassionate release"); *United States v. Ramirez*, No. 17-CR-10328-
WGY (Apr. 20, 2020) (ECF # 115) ("The Court concludes it is here appropriate to waive
the 30 day exhaustion requirement."); *cf. United States v. Capelton*, No. 3-00-CR-30027-
MGM (Apr. 10, 2020) (ECF # 538) ("Moreover, while the court recognizes there is a split
in the case law as to whether it can waive the administrative exhaustion requirement,
the court is persuaded by the cases holding that it can, especially under these
circumstances when Defendant has less than 30 days of incarceration remaining.").

[52]    *Calderon Jimenez v. Cronen*, D. Mass. No. 18-CV-10225-MLW (Mar. 26, 2020) (ECF
# 507-1 at 4) ("If the petitioner is infected and dies, the case will be moot. The habeas
remedy will be ineffective.").

Moreover, it is not as if BOP is unaware of the circumstances or has not had ample time to act. The COVID-19 crisis has been unfolding for weeks. On March 26, the Attorney General directed BOP to make greater use of home confinement.[53]  The Attorney General expanded his directive on April 3.[54]  Yet by April 5, BOP had placed just an additional 566 inmates nationwide on home confinement[55]  (out of more than 140,000 federal inmates[56]), and as of April 21, that number has grown to only 1,362 inmates.[57]  In short, BOP is failing to act and without the courts' intervention, vulnerable inmates like Pena will continue to pay the price.

In sum, § 3582(c)(1)(A) is not jurisdictional; it does not operate like a traditional exhaustion requirement; the usual reasons for exhaustion do not apply here; and BOP could have acted but has failed to do so. The Court should not force Pena to wait an additional 17 days for the Court to decide this motion.[58]

---

[53]    https://www.justice.gov/file/1262731/download

[54]    https://www.justice.gov/file/1266661/download

[55]    https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp

[56]    https://www.bop.gov/about/statistics/population_statistics.jsp

[57]    https://www.bop.gov/coronavirus/

[58]    In the event the Court declines to waive the 30-day exhaustion requirement, it should grant the motion immediately after 30 days have elapsed (May 8, 2020)

## Conclusion

There is no dispute that Pena committed a serious offense and deserved (and still deserves) serious punishment. At the same time, the world looks different now than it does when Pena was sentenced in April 2019. Under 18 U.S.C. § 3582(c)(1)(A)(i), when an defendant presents "extraordinary and compelling reasons," as Pena has here, the Court must consider the relevant sentencing factors in 18 U.S.C. § 3553(a) to determine if a sentence reduction is warranted. Pena is not a threat to the community, nor does he present any likelihood of flight. Given the circumstances, an equivalent sentence of home confinement is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

Respectfully submitted,

ROBERT PENA,

By his attorney,

/s/ Scott Katz
Scott Katz (BBO # 655681)
Scott Katz Law
1600 Providence Highway
Walpole, MA 02081
(617) 545-4488
scott@scottkatzlaw.com

Dated: April 21, 2020

## Local Rule 7.1(a)(2) Certification

I hereby certify that I have conferred in good faith with Assistant U.S. Attorney Brian LaMacchia, counsel for the government in this matter, but we have been unable to resolve or narrow the issues in this motion.

/s/ Scott Katz
Scott Katz

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on April 21, 2020.

/s/ Scott Katz

Scott Katz