UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

ROBERT M. PENA,

Defendant.

Criminal No. 16-10236-MLW

## UNITED STATES' OPPOSITION TO
## DEFENDANT'S EMERGENCY MOTION FOR
## COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)(i)

The Court sentenced Robert Pena, the owner and operator of the now-defunct Mortgage

Security, Inc. ("MSI"), to 32 months in prison for stealing $2.5 million in mortgage loan

proceeds from the Government National Mortgage Association ("Ginnie Mae"). His fraud—a

systematic diverting of funds and falsification of records over approximately 18 months—

destroyed MSI, a financial institution, and left Ginnie Mae, a government corporation that helped

him over many years, to pick up the pieces. Now, citing the risk of COVID-19 infection, Mr.

Pena has moved the Court to resentence him pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), to spend

the remainder of his sentence at his home, rather than at the Camp at Federal Medical Center,

Devens ("FMC Devens").

Mr. Pena also petitioned the Bureau of Prisons ("BOP") for compassionate release. He

submitted that request on April 8, 2020. Two weeks later, on April 22, 2020, the BOP notified

him that the Warden of FMC Devens denied his petition. (*See* Ex. A.) The government

understands that Mr. Pena did not qualify for release under BOP policy, at least in part because

he has served only six months imprisonment—less than a fifth of the term imposed by the Court. Mr. Pena could pursue further administrative remedies, but as of this filing, the government is not aware that Mr. Pena has done so. As discussed further below, given that further administrative remedies are available and the fact that less than 30 days have passed since Mr. Pena petitioned the BOP, the Court should deny his motion for failure to exhaust those remedies.

Even looking past the exhaustion issue, Mr. Pena's motion should fail on the merits. The government is certainly mindful of the risks associated with the COVID-19 pandemic generally, and in particular as it relates to inmates. Indeed, the government wishes that our society can limit the virus's spread, and that no one suffers significant complications from it, including Mr. Pena. But considering all the circumstances—including Mr. Pena's serious crime, his particular circumstances, the BOP's substantial efforts to prevent COVID infection among its inmates, the actual conditions at FMC Devens, and the likelihood that home confinement would present a substantial risk of infection compared to remaining in that facility—the government does not believe that Mr. Pena has demonstrated "extraordinary and compelling reasons" under 18 U.S.C. § 3582(c)(1)(A)(i) for such a substantial change in his sentence.

## BACKGROUND

### I.    BOP Is Taking Extraordinary Steps to Prevent COVID-19 Infection.

Contrary to what Mr. Pena's motion suggests, the BOP has been taking extraordinary steps to prevent the spread of COVID-19 in its facilities, including FMC Devens. Since at least October 2012, the BOP has had a Pandemic Influenza Plan. (*See* BOP Health Management Resources, https://www.bop.gov/resources/health_care_mngmt.jsp.) In January 2020, the BOP began to plan specifically for COVID-19 to ensure the health and safety of inmates and BOP personnel. (*See* BOP COVID-19 Action Plan, https://www.bop.gov/resources/news/ 20200313_covid-19.jsp.) Since then, it has been monitoring and tracking the spread of the

virus when the first cases appeared in the United States. (*See* Declaration of Megan Shaw, M.D. ("Shaw Decl.") ¶ 6, previously filed in *Grinis v. Spaulding*, No. 20-CV-10738-GAO (D. Mass. 2020) [Dkt. No. 32-1], and attached here as Ex. B.) Recognizing the threat that this virus could pose to its inmate population, the BOP began organizing its national pandemic response through a multiphase "Action Plan." (*Id.*)

> **Phase One.** As part of that Action Plan's Phase One response, which began in January 2020, the BOP began to study where in the United States the infections were occurring and best practices to mitigate the virus's transmission. (*Id.* ¶ 7.) In addition, the BOP established an agency task force to study and coordinate its response, including using "subject-matter experts both internal and external to the agency including guidance and directives from the World Health Organization (WHO), the Centers for Disease Control and Prevention (CDC), the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President." (*Id.*)

> **Phase Two.** On March 13, 2020, the BOP implemented its Phase Two response "to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." (*See* BOP COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp.) These national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." (*Id.*, *accord* Shaw Decl. ¶ 8.) For example, the BOP (a) suspended social visits for 30 days (but increased inmate access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmate movement for 30 days (with case-by-case exceptions, including for medical

treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities."  (*See* BOP COVID-19 Action Plan, https://www.bopgov/resources/news/20200313_covid-19.jsp; *accord* Shaw Decl. ¶ 8.)  In addition, the BOP implemented screening protocols for both staff and inmates, with staff being subject to enhanced screening and inmates being subject to screening managed by the BOP's infectious disease management programs.  (*See* BOP COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp.)  As part of the BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms;" (ii) "[a]symptomatic inmates with exposure risk factors are quarantined; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols."  (*Id.*; *accord* Shaw Decl. ¶¶ 9-11.)

   *Phase Three.*  On March 18, 2020, the BOP implemented Phase Three, which entailed: (a) implementing an action plan to maximize telework for employees and staff; (b) inventorying all cleaning, sanitation, and medical supplies; (c) making sure that ample supplies were on hand and ready to be distributed or moved to any facility as deemed necessary; and (d) placing additional orders for those supplies, in case of a protracted event.  (*See* BOP Update on COVID-19, *at* ttps://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19 _update.pdf; Shaw Decl. ¶¶ 13-14.)

   *Phase Four.*  On or about March 26, 2020, the BOP implemented Phase Four, which entailed: (a) updating its quarantine and isolation procedures to require all newly admitted

inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check (including all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival); (b) placing asymptomatic inmates in quarantine for a minimum of 14 days or until cleared by medical staff; and (c) placing symptomatic inmates in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. (*See* BOP COVID-19 Action Plan: Phase Five, https://www.bop.gov/resources/news/20200331 _covid19 _action_plan\_5.jsp; Shaw Decl. ¶ 15.)

   ***Phase Five.*** On March 31, 2020, the BOP implemented Phase Five, which entails: (a) securing inmates in every institution to their assigned quarters for a 14-day period to decrease the spread of the virus; (b) to the extent practicable, offering inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education; (c) coordinating with the United States Marshals Service to significantly decrease incoming movement; (d) preparing to reevaluate after 14 days and make a decision as to whether or not to return to modified operations; and (e) affording limited group gathering to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access. (*See* BOP COVID-19 Action Plan: Phase Five, https://www.bop.gov/resources/news/20200331_covid19_action_plan\_5; Shaw Decl. ¶ 16.)

   ***Phase Six.*** On April 13, 2020, the BOP implemented Phase Six, which included extended medical screening, limited inmate gatherings, daily rounds, limited external movement, and fit testing. (*See* Shaw Decl. ¶ 17.)

***Efforts to Increase Home Confinement.*** "[M]any inmates will be safer in BOP facilities where [infection within] the population is controlled and there is ready access to doctors and medical care." (*See* Declaration of Amber Bourke ("Bourke Decl.") ¶ 4, previously filed in *Grinis v. Spaulding*, 20-cv-10738-GAO [Dkt. No. 36-1] and attached here as Exhibit C.) However, the BOP recognizes that, in some cases, home confinement might be more effective in protecting an inmate's health. (*Id.*) Accordingly, the BOP has also "increased Home Confinement by over 40% since March and is continuing to aggressively screen all potential inmates for Home Confinement." (Update on COVID-19 and Home Confinement, https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp.) In addition, the BOP "has begun immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC, starting with the inmates incarcerated at [certain facilities with COVID-19 outbreaks] to determine which inmates are suitable for home confinement." (*Id.*)

***Additional Measures.*** The BOP's efforts are ongoing. Most recently, the BOP announced expanded COVID-19 testing of inmates utilizing Rapid RNA testing at facilities experiencing widespread transmission. (*See* BOP Expands COVID-19 Testing, https://www.bop.gov/resources/news/20200424_expanded_testing.jsp.) In addition to confirming which inmates are infected, this testing is intended to identify asymptomatic and pre-symptomatic inmates to assist the BOP in slowing transmission and isolating those individuals who test positive. (*Id.*) The BOP expects to expand its rapid testing capability in the coming weeks and deploy these capabilities "based on facility need to contain widespread transmissions and the need for early, aggressive interventions required to slow transmission at facility with a high number of at-risk inmates such as medical referral centers." (*Id.*)

## II. FMC Devens, in Particular, Has Successfully Prevented the Spread of COVID-19 at the Medical Center and the Camp.

Contrary to what Mr. Pena's motion portrays, the facility has taken—and continues to take—extraordinary steps to prevent infection, under the BOP's COVID-19 Action Plan.

FMC Devens is an Administrative security level institution designed to house approximately 1,200 inmates at the main facility and approximately 128 inmates at the adjacent Federal Prison Camp ("the Camp"), where Mr. Pena is located. (*See* Bourke Decl. ¶ 24.) The Camp houses inmates with much lower incidence of the CDC risk factors for increased mortality with COVID-1, compared to the elderly and more medically complicated inmates at the Federal Medical Center facility. (Shaw Decl. ¶ 61.) The main Federal Medical Center facility and the Camp are separate facilities, and the inmate populations do not interact with one another. *Id.* As a result, Mr. Pena interacts with a small fraction of the inmates and staff. The Health Services Department at FMC Devens is staffed by a comprehensive team of BOP and Public Health Service health care workers. (Shaw Decl. ¶ 2-4.) The facility offers "comprehensive ambulatory care addressing primary care, chronic care, emergent and acute care." (*Id.*)

FMC Devens has implemented BOP's Action Plan, in compliance with BOP's national directives, and has also taken numerous other measures to fight the introduction and spread of COVID-19 within its facilities, such as: providing inmate and staff education; conducting inmate and staff screening; putting into place testing, quarantine, and isolation procedures in accordance with BOP policy and CDC guidelines; ordering enhanced cleaning and medical supplies; instituting a "grab and go" meal system and staggered meal times; and adjusting programming to ensure that inmates from different housing units do not mix. (Shaw Decl. ¶¶ 12, 19-59.)

At the Camp in particular, FMC Devens has taken additional steps, including:

***Inmate Screening.*** All inmates are screened daily for symptoms of COVID-19 and

fever and, if positive, placed in isolation at the Federal Medical Center facility. (Shaw Decl. ¶ 60.) The Camp has established an Isolation Exam Room in order to immediately isolate any symptomatic inmate away from the rest of the Camp inmates. (*Id*.) The Camp staff are being screened prior to work with the same enhanced procedures. (*Id.* ¶ 63.)

 ***Social Distancing.*** The Camp as a whole is sheltering in place and Health Services is providing medical care at the Camp. (*Id.* ¶ 62.) In addition, any Camp inmates needing to go to the FMC Health Services Division or Dental are being assigned a staggered scheduling time so that they are not exposed to any other inmates. (*Id*.) All work assignments have been changed so that no inmates are going into the community. (*Id.* ¶ 61.) Camp staff and inmates must wear facemasks at all times. (*Id.* ¶ 63.)

 ***Identifying Inmates for Expanded Home Confinement.*** Like the BOP more generally, FMC Devens is in the process of transitioning appropriate inmates to home confinement, consistent with its internal policies and procedures. Health Services staff developed a tool to identify high-risk inmates per the CDC website definition and are screening these inmates for referral to expanded home confinement. (Shaw Decl. ¶ 57.) This analysis includes education and collaboration between the inmate and his medical provider on whether his risks for COVID-19 are greater at home or at the institution. (*Id*.) In addition, Health Services is diligently completing the medical summaries necessary to process the Reduction in Sentence/Compassionate Release requests that have been requested and are complying with all deadlines for this important process. (*Id*.) While Mr. Pena is not yet eligible under the BOP's program, other inmates are eligible and have been moved, or in the process of being moved, to home confinement. (Burke Decl. ¶ 26.) As of April 24, 2020, FMC Devens has moved eight inmates to home confinement, and 12 more are being vetted for approval. (*Id.*)

### III. The Circumstances of the First Positive Case at FMC Devens Demonstrate that the Facility's Procedures are Working.

Despite the spread of COVID-19 worldwide since the fall, FMC Devens did not have its first confirmed case until April 24, 2020. As the undersigned Assistant U.S. Attorney understands based on conversations with BOP, the affected inmate had been placed in 14-day quarantine after returning from medical treatment at an outside facility and was tested after he began exhibiting COVID-19 symptoms during quarantine. The inmate, therefore, does not appear to have been in contact with other inmates at FMC Devens while infected, and BOP staff believe, based on the circumstances, that the inmate became infected while at the outside medical facility. It is also worth noting that the inmate resides in the separate Federal Medical Center, not the Camp where Mr. Pena resides. Thus, the circumstances of this particular infection actually demonstrate the effectiveness of the facility's procedures in protecting inmates and staff, not to mention the lack of risk to Mr. Pena personally.

## ARGUMENT

Mr. Pena's motion should be denied because, as discussed below, (1) his fear of being infected by COVID-19 and his particular health conditions are not, together or individually, "extraordinary and compelling reasons" under § 3582(c) for drastically reducing his sentence, and (2) he has not exhausted his administrative remedies, as required by 18 U.S.C. § 3582(c).

### 1. Mr. Pena Has Failed to Demonstrate "Extraordinary and Compelling Reasons" under 18 U.S.C. § 3582(c) for Drastically Modifying His Sentence.

Under 18 U.S.C. § 3582(c), a court generally "may not modify a term of imprisonment once it has been imposed," except in limited circumstances.[1] In this case, Mr. Pena moves to

---

[1] Those circumstances are: (1) upon a motion for reduction in sentence under 18 U.S.C. § 3582(c)(1)(A); (2) "to the extent otherwise expressly permitted by statute or by Rule 35 of the

modify his sentence under 18 U.S.C. § 3852(c)(1)(A), whereby a court may reduce a prisoner's sentence "if it finds that" (1) "extraordinary and compelling reasons warrant such a reduction" and (2) the reduction is "consistent with applicable policy statements issued by the Sentencing Commission." As the proponent of release, Mr. Pena bears the burden of proving that "extraordinary and compelling reasons" exist. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease.")

Section § 3582 does not define "extraordinary" or "compelling," but the Sentencing Guidelines Policy Statement, U.S.S.G. § 1B1.13, makes clear that the circumstances are exceedingly narrow. Application Note 1 to U.S.S.G. § 1B1.13, states in pertinent parts that extraordinary and compelling reasons exist when:

(A) Medical Condition . . .

> (ii) The defendant is — (I) suffering from a serious physical or medical condition, (II) suffering from a serious functional or cognitive impairment, or (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide selfcare within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant – The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

\*\*\*

(D) Other Reasons. — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

Considering the very limited circumstances under which a court can modify a sentence

---

Federal Rules of Criminal Procedure," 18 U.S.C. § 3582(c)(1)(B); and (3) where the defendant was sentenced based on a retroactively lowered sentencing range, 18 U.S.C. § 3582(c)(2).

under § 3582(c), Mr. Pena has not demonstrated extraordinary and compelling reasons for his release on home confinement:

First, Mr. Pena fails to meet any of the criteria outlined in U.S.S.G. § 1B1.13. Mr. Pena is not suffering from any serious physical or medical condition, serious functional or cognitive impairment, or substantially diminished ability to provide selfcare. While he is over 65, he is not experiencing a serious age-related deterioration, and he has not served at least 10 years or 75 percent of his or her term of imprisonment. And the Director of the Bureau of Prisons, rather than proffering a reason Mr. Pena should be released to home confinement, has determined the opposite, that he should remain incarcerated, even considering the facts and circumstances of his heath and the current pandemic.[2]

Second, although Mr. Pena lists multiple conditions—some verifiable, some overstated, and most unsubstantiated[3]—in order to justify his particularized susceptibility to COVID-19,

---

[2]    Some courts have ruled that Application Note 1(D) suggests they have the "discretion to grant compassionate release motions on grounds that are distinct from, but of similar magnitude and importance to, those specifically enumerated in Application Note 1." *See, e.g.*, *United States v. Pinto-Thomaz*, 18-cr-597 (JSR), 2020 WL 1845875, at *2 (S.D.N.Y. Apr. 13, 2020). This, however, ignores that such reasons must be "[a]s determined by the Director of the Bureau of Prisons," which has not occurred here. In any event, even those courts reading Application Note 1's language broadly agree that the exceptions that justify a change in sentence are exceedingly narrow. *See*, *e.g.*, *id.*

[3]    The United States agrees that Mr. Pena presents with at least one verifiable risk factor for complications from COVID-19 based on the risk factors identified by the Centers for Disease Control ("CDC")—his age (70). But that, alone, is not an "extraordinary and compelling reason" for release. *See*, *e.g.*, *United States v. Haney*, No. 19-cr-541-JSR, 2020 WL 1821988, at *5 (S.D.N.Y. Apr. 13, 2020) (If a 60-year-old defendant's age "alone were a sufficient factor to grant compassionate release . . . every federal inmate in the country above the age of 60 should be forthwith release from detention, a result that does not remotely comply with the limited scope of compassionate release . . . .").

His motion claims that he presents with other factors but fails to substantiate to what extent those complications present a substantial risk of serious complications from COVID-19. This is, in part, because his motion lacks any supporting medical records or affidavits from medical professionals backing up his claims and, in part, because some of his claimed risks seem

the fear of infection during incarceration is not an extraordinary or compelling reason

warranting home confinement under the circumstances.  As the Third Circuit opined in *United*

*States v. Raia*, "the mere existence of COVID-19 in society and the possibility that it may

spread to a particular prison alone cannot independently justify compassionate release,

especially considering BOP's statutory role, and its extensive and professional efforts to curtail

the virus's spread." -- F.3d --, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020); *cf. United States*

*v. Korn*, No. 15-CR-81S, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("[I]n this Court's

view, the mere <u>possibility</u> of contracting a communicable disease such as COVID-19, without

any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease,

does not constitute an extraordinary or compelling reason for a sentence reduction under the

statutory scheme.") (emphasis in original)  The spread of the virus within the United States puts

everyone at some degree of risk of getting sick, but as discussed above, the BOP has taken

appropriate steps to mitigate those risks throughout its inmate population, and the

implementation of those at FMC Devens, where Mr. Pena is incarcerated, are proving effective.

---

overstated to meet CDC risk factors.  As examples of this last point, Mr. Pena suggests that: (i) because he received corticosteroids during this lifetime he meets the CDC risk factor of being immunocompromised by prolonged use of corticosteroids (Mot. at 5); (ii) because he has been diagnosed as <u>pre</u>-diabetic he meets the CDC risk factor of being diabetic (*id.*); and (iii) because he has been told by someone that his kidneys are compromised he meets the CDC risk factor for chronic kidney disease undergoing dialysis (*id.*).  He also cites his race as a risk factor, but while the government is aware of data suggesting that minorities have heightened risk for complications from COVID-19, that is not a factor currently cited by the Centers for Disease Control.  (*See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html; *but cf.* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html (discussing data concerning minorities).)  The Court, therefore, should view Mr. Pena's proffered medical conditions with some skepticism, as presently presented to the Court. *Cf. United States v. Washington*, No. 14-CR-215, 2020 WL 1969301, at *1 (W.D.N.Y. Apr. 24, 2020) ("But without any medical evidence or the opinion of a physician, this Court is unable to conclude that Washington falls within that category.  Stated more simply, this Court has no medical evidence upon which to conclude that COVID-19 poses increased lethality to Washington.")

As another court put it, Mr Pena "has also not shown that the plan proposed by the Bureau of Prisons is inadequate to manage the pandemic within [the] correctional facility, or that the facility is specifically unable to adequately treat [him]." *United States v. Gileno*, No. 3:19-cr-161-(VAB), 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020).

If the Court denied Mr. Pena's motion, it would be among many courts not finding "extraordinary and compelling reasons" for a sentence reduction due to COVID-19. *See, e.g.*, *United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020) ("[S]peculation as to whether COVID-19 will spread through Defendant's detention facility, FCI Morgantown, whether Defendant will contract COVID-19, and whether he will develop serious complications, does not justify the extreme remedy of compassionate release. Defendant's current medical conditions are not out of the ordinary, nor does Defendant claim they are fatal or untreatable.") In fact, many courts have denied motions from inmates with similar or worse medical conditions than Mr.Pena and who are residing in institutions with more instances of COVID-19. *See, e.g.*, *United States v. Feiling*, No. 3:19cr112 (DJN), 2020 WL 1821457, at *7-8 (E.D. Va. Apr. 10, 2020) (denying release for 71-year-old suffering from a variety of ailments putting him at risk of an adverse outcome from COVID-19 because he does not show a greater risk of contracting the disease in prison, in relation to his risk in the community); *Korn*, 2020 WL 1808213, at *4 (denying release for 62-year-old defendant "with cerebral palsy and a range of cardiac, vascular and pulmonary diseases" because he has not established that BOP facility with 40 confirmed cases has an inadequate plan for preventing infection and treating defendant, if infected).[4] To be sure, courts have granted compassionate

---

[4]     Additional cases: *United States v. Washington*, No. 14-CR-215, 2020 WL 1969301, at *1 (W.D.N.Y. Apr. 24, 2020) ("generalized claim of asthma, without more, is not a sufficiently extraordinary and compelling reason for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)");

release motions based on COVID-19, but those mostly seem to involve defendants (i) with more serious ailments than Mr. Pena and (ii) who have served most of their incarcerative sentence, unlike Mr. Pena. *See, e.g.*, *United States v. McCarthy*, NO. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *2 (D. Conn. Apr. 8, 2020) (defendant has 26 days remaining on sentence; "is 65 years old and suffers from a host of medical ailments, including chronic obstructive pulmonary disease . . . and asthma").[5]

---

*United States v. Fry*, No. CR111414PAMKMM, 2020 WL 1923218, at *1 (D. Minn. Apr. 21, 2020) (denying compassionate release for COVID-19 for defendant who is 66-years old, obese, and has heart disease and high blood pressure); *United States v. Aguila*, No. 2:16-cr-00046-TLN, 2020 WL 1812159, at *1-2 (E.D. Cal. Apr. 9, 2020) (The defendant "claims he has high blood pressure, high cholesterol, sleep apnea, and diabetes, [but] fails to provide evidence to verify these claims," and his "arguments about COVID-19 are too general and wide-ranging."); *United States v. Credidio*, No. 19 Cr. 111 (PAE), 2020 WL 1644010, at *1 (S.D.N.Y. Apr. 2, 2020) (denying motion of 72-year-old inmate deemed by BOP to be at high risk of COVID-19 complications, because "a lengthy term of imprisonment is required for [the defendant] for all the reasons reviewed at sentencing"); *United States v. Hamilton*, No. 19-cr-54-01, 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (finding that the COVID-19 pandemic did not constitute "a sufficiently compelling reason to justify release under [§ 3142(i) ]" despite detainee's high risk for infection because "there have been no reported incidents of COVID-19 [at his facility] and [BOP] is taking system-wide precautions to mitigate the possibility of infection within its facilities."); *United States v. Eberhart*, No. 13-cr-00313-PJH-1, 2020 WL 1450745, at *2 (N.D. Cal. March 25, 2020) ("General concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement on compassionate release, U.S.S.G. § 1B1.13."); *United States v. Garza*, No. 10cr-1745-BAS, 2020 WL 1485782, at *2 (S.D. Cal. March 27, 2020) (denying motion for sentence reduction for 54-year old man with no prior criminal record sentenced to 24 months); *United States v. Lisi*, No. 15 Cr. 457 (KPF), 2020 WL 881994, at *5 (S.D.N.Y. Feb. 24, 2020) (denying motion of defendant suffering from, among other things, asthma and high blood pressure; "The sentencing factors weigh heavily against the reduction of [the defendant's] sentence to time served."), *reconsideration denied*, 2020 WL 1331955 (S.D.N.Y. Mar. 23, 2020).

[5]      Additional cases: *United States v. Asaro*, No. 17-cr-127 (ARR), 2020 WL 1899221, at *5-6 (E.D.N.Y. Apr. 17, 2020) (85-year-old suffered stroke, has expressive aphasia); *United States v. Coker*, No. 3:14-CR-085, 2020 WL 1877800, at *3 (E.D. Tenn. Apr. 15, 2020) (inmate with emphysema, COPD, and nearly 24-hour-per-day reliance on oxygen and a wheelchair, served more than half of 96-month term for drug offense); *United States v. Burrill*, No. 17-cr-00491-RS-1, 2020 WL 1846788, at *2-3 (N.D. Cal. Apr. 10, 2020) (75-year-old suffering from "asthma, high blood pressure, high cholesterol, diabetes, diverticulosis, blood clots, hearing loss, glaucoma, cataracts, and lower back nerve pain" served about half of 30-month sentence for

Third, Mr. Pena has not demonstrated how his release to home confinement would reduce his risk of either contracting COVID-19 or developing serious complications from it, compared to residing at FMC Devens. Home confinement is not necessary if it does not alleviate the risk from the virus compared to incarceration. Whether Mr. Pena remains at FMC Devens or sits at home, he still presents the same and is still at risk for contracting COVID-19. Mr. Pena's motion, however, falls flat on this point. It assumes, with few details, that his particular home situation presents less risk of infection than FMC Devens. Other than mentioning his wife, he does not describe, for example, the residence itself; whether others reside there; whether or how frequently his wife or others residing at his home come and go; whether or how frequently his wife or others residing at his home have contact with others potentially infected with COVID-19, such as through work or other activities; whether his wife or others residing at his home practice appropriate measures to prevent the spread of COVID-19, such as those at FMC Devens. These are serious questions because, as of April 26, 2020, Barnstable Country, where Mr. Pena's home is located, has nearly 772 confirmed cases, and neighboring Plymouth County, very close to Mr. Pena's home, has 4,495. (*See* https://www.

investment adviser fraud); *United States v. Hansen*, No. 07-CR-00520(KAM), 2020 WL 1703672, at *7-10 (E.D.N.Y. Apr. 8, 2020) (72-year-old inmate with "laundry list" of serious ailments served half of 20-year mandatory drug sentence that the sentencing judge thought was excessive); *United States v. Colvin*, No. 3:19cr179 (JBA), 2020 WL 1613943, at *3-4 (D. Conn. Apr. 2, 2020) (inmate with high blood pressure and diabetes with 11 days remaining on sentence); *United States v. Jepsen*, No. 3:19-cv-00073(VLB), 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020) ("Mr. Jepsen is in the unique position of having less than eight weeks left to serve on his sentence, he is immunocompromised and suffers from multiple chronic conditions that are in flux and predispose him to potentially lethal complications if he contracts COVID-19, and the Government consents to his release."); *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020) (inmate vulnerable due to Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension, obesity, and "abnormal liver enzymes in a pattern most consistent with non-alcoholic fatty liver disease," has only one year left on 20-year sentence).

boston.com/news/health/2020/03/09/updating-stats-numbers-covid-19-massachusetts, last checked Apr. 27, 2020 at 11:22 am.)

Given the prevalence of COVID-19 around Mr. Pena's home, the Court should be concerned that Mr. Pena's release on home confinement may present <u>more</u> risk to his health and his wife's. For one, Mr. Pena's wife is, as the government understands, nearly as old as Mr. Pena and may have health conditions that put her at risk. If Mr. Pena is on home confinement, his wife likely will be put in the position of caring for him—including venturing outside the home to run errands and frequently exposing herself to COVID-19 infection and possible complications. Moreover, on home confinement, Mr. Pena will be forced to seek medical care in a community that more than 5,000 times more instances of COVID-19 than his current environment. Like the FMC Devens inmate who likely became infected <u>outside</u> of FMC Devens, Mr. Pena will be subject to greater risk of infection. Furthermore, if Mr. Pena or his wife become infected with COVID-19 while he was on home confinement, it is not at all clear that he or she could implement quarantine procedures like FMC Devens to avoid infecting the other (or others in the home), or that he will have access to medical care equivalent to what is available at FMC Devens (which contains its own on-site medical facility). As a result, the Court cannot say that Mr. Pena's "plan" for home confinement (whatever that is) actually alleviates the issue concerning the potential of suffering serious complications from COVID-19.[6] *Cf. United States v. Davenport*, No. 17 Cr. 61 (LAP), 2020 WL 1814184, at *1 (S.D.N.Y.

---

[6] In contrast to Mr. Pena's motion, before BOP would release a defendant to home confinement, BOP would conduct a thorough assessment about whether that would be an appropriate place for home confinement, and whether that location would be better for the defendant than at FMC Devens. (Bourke Decl. ¶ 25). To the extent the Court is considering releasing Mr. Pena, it should request that Probation conduct a similar assessment and base its determination on the facts found by that assessment, rather than Mr. Pena's proffers.

Apr. 9, 2020) (denying motion of defendant with diabetes and heart disease because "there are no current cases of COVID-19 at Schuylkill but . . . Haverford, the town in which [the defendant] proposes to be released, has one of the highest rates of COVID-19 infection in the Commonwealth of Pennsylvania").

Finally, Mr. Pena's motion fails to demonstrate that his release on home confinement satisfies the relevant § 3553(a) factors, which the Court should consider in modifying a sentence under § 3582(c).  *See* 18 U.S.C. § 3582(c) ("the court . . . may reduce the term of imprisonment . . . , after considering the factors set forth in section 3553(a) to the extent that they are applicable").  In sentencing Mr. Pena to a 32-month term of imprisonment, the Court emphasized the need for a tough sentence:

> And with regard to the nature and circumstances of the offense, you did commit a very serious crime, and you committed it over a long period of time.  It takes planning and energy and determination to misrepresent what's happening with the payments on mortgages in many cases and to get the books fraudulently prepared in anticipation of audits.  And, you know, you were a beneficiary of a government program that aimed to teach you how to do this business that had the potential and probably was for a period of time a lucrative business and to share—you know, to benefit from expanded opportunities for home ownership that Ginnie Mae has constituted to provide.  And by engaging in fraud, you may have discouraged opportunities for other people to get into this business who might not have been bred to it, to become bankers in effect, and injured the ability of Ginnie Mae to serve its important mission.  $2.5 million is a lot of money.  You know that.

(Sentencing Trans. [Dkt. No. 163] at 37:18-38:8.)  In addition to also considering Mr. Pena's personal circumstances, including his charitable works, and his family and medical history (*id*. at 38:9-13), the Court also noted the need to deter others from similar crimes "because fraud is a crime of calculation" (*id.* at 30:17-18):

> [I]n these fraud cases, the interest of general deterrence is in my view an important consideration that there are other people out there whose businesses are in distress, and they would like to keep those businesses and keep profiting from those businesses, and they may be tempted to engage in fraud, and they may calculate that they won't get caught.  If they get caught, they won't get convicted.  If they get convicted, they won't have to go to prison, or for very long.  And hopefully this

sentence as effectively as a 50-month sentence [the government recommends] or comparably to a 50-month sentence would send the message that's a miscalculation. You will get caught. You will get convicted, and you will get a serious punishment.

(*Id.* at 39:14-25.)

These reasons, which the Court found required 32 months' incarceration, are the same today as they were on the day of sentencing. Indeed, the need for general deterrence in fraud cases requires particular emphasis now, where more people's businesses are in distress and may be tempted, as Mr. Pena was, to turn to fraud to keep them afloat and continuing profiting. Even Mr. Pena, himself, agreed that he deserved a substantial incarcerative sentence; as the Court may recall, he requested a sentence that included 24 months' imprisonment, consistent with his plea agreement with the government. Mr. Pena's generalized concerns about risk of infection do not diminish or outweigh these reasons.

### 2. Mr. Pena Failed to Exhaust His Administrative Remedies.

Putting aside the issues with the merits of Mr. Pena's motion, the compassionate release statute, 18 U.S.C. § 3582(c), provides that except in limited circumstances, a "court may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). That statute further requires that a request for compassionate release be presented first to the BOP for its consideration. Only after 30 days have passed, or the defendant has exhausted all administrative rights to appeal the BOP's failure to move on the defendant's behalf, may a defendant move for compassionate release in court. *Id.*[7] That restriction is mandatory, as the Third Circuit recently

---

[7] The statute reads, in relevant part:

The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

confirmed: where 30 days have not passed following presentation of a request to a warden, the statute "presents a glaring roadblock foreclosing compassionate release at this point." *Raia*, 2020 WL 1647922, at *2.[8]  Because Mr. Pena has not exhausted all administrative remedies, and 30 days have not passed since he applied to the BOP for compassionate release in which to allow that administrative process to proceed, the Court lacks authority to act on Mr. Pena's motion.

While Mr. Pena argues that the Court can skip past the procedural prerequisites in § 3582(c), that argument is not supported by the plain language of the statute, and this Court recently held that exhaustion is required.  *United States v. Muniz*, No. 16-cr-10170-MLW (D. Mass. Apr. 16, 2020.  Although Mr. Pena cites some cases concluding that exhaustion is not required, the vast majority of district courts that have reached the issue have also required exhaustion, consistent with this Court's determination in *Muniz.  See, e.g.*, *United States v. Ogarro*, 18 Cr. 373 (RJS) (S.D.N.Y., April 14, 2020) [Dkt. 666, at 6]. ("[S]ection 3582's

---

(2)      . . . (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . .

*Id.* § 3582(c)(1)(A).

[8]      As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion).  Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only pursuant to statutory authorization.  *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted)

exhaustion requirement is clear as day.").[9]  Thus, Mr. Pena's failure to exhaust his administrative remedies is an alternate reason to deny his motion.

<u>**CONCLUSION**</u>

Even if Mr. Pena had exhausted his administrative remedies, he has failed to demonstrate "extraordinary and compelling reasons" for reducing the incarcerative portion of his sentence by 80% (and by 18 months less than he recommended at sentencing).  He is understandably worried about infection, as we all are, but he has not demonstrated that FMC Devens is not taking adequate measures to prevent infection or would not appropriately treat him if he became infected.  Equally important, he has not carried his burden of demonstrating that home confinement, in his circumstances, is appropriate under 18 U.S.C. § 3553(a) or a safer or more workable alternative.[10]

---

[9]     Additional cases: *United States v. Rabadi*, 13 Cr. 353 (KMK) (S.D.N.Y., April 14, 2020) [Dkt. 93, at 5-6] (noting "vast majority" of cases holding that prisoners must exhaust administrative remedies).  Some of the many cases finding that exhaustion is required:  *Roberts*, 18-CR-528-5 (JMF), 2020 WL 1700032, at *2 (S.D.N.Y. April 8, 2020); *United States v. Canale*, No. 17 Cr. 287 (JPO), 2020 WL 1809287, at *1 (S.D.N.Y. Apr. 9, 2020); *United States v. Woodson*, No. 18 Cr. 845 (PKC), 2020 WL 1673253, at *4 (S.D.N.Y. Apr. 6, 2020); *United States v. Weiland*, No. 18 Cr. 273 (LGS), 2020 WL 1674137, at *1 (S.D.N.Y. Apr. 6, 2020); *United States v. Johnson*, No. 14-CR-4-0441, 2020 WL 1663360, at *1 (D. Md. Apr. 3, 2020); *United States v. Carver*, No. 19 Cr. 6044, 2020 WL 1604968, at *1 (E.D. Wa. Apr. 1, 2020); *United States v. Clark*, No. 17 Cr. 85 (SDD), 2020 WL 1557397, at *3 (M.D. La. Apr. 1, 2020); *United States v. Hernandez*, No. 18 Cr. 834 (PAE), 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020); *United States v. Cohen*, No. 18 Cr. 602 (WHP), 2020 WL 1428778, at *1 (S.D.N.Y. Mar. 24, 2020).

[10]     For the reasons herein, the government also opposes Mr. Pena's motion for an indicative ruling [Dkt. No. 173].

Respectfully submitted,

ANDREW E. LELLING
United States Attorney,
District of Massachusetts

By: */s/ Brian M. LaMacchia*
    Brian M. LaMacchia
    Assistant U.S. Attorney
    John J. Moakley U.S. Courthouse
    One Courthouse Way, Suite 9200
    Boston, MA 02110
    617-748-3126
Dated: April 27, 2020    brian.lamacchia@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

*/s/ Brian M. LaMacchia*
Brian M. LaMacchia
Assistant U.S. Attorney

Dated: April 27, 2020