UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                            )
        v.                  )        Cr. No. 16-10236-MLW
                            )
ROBERT M. PENA,             )
        Defendant.          )

MEMORANDUM AND ORDER

WOLF, D.J.                                        May 29, 2020

This Memorandum is based upon the transcript of the decision rendered orally on May 15, 2020. This Memorandum adds a summary and some citations, deletes some colloquy, and clarifies some language.

* * *

I.   SUMMARY

Defendant Robert Pena is serving a 32-month sentence for defrauding the United States government of $2,500,000. On April 21, 2020, Pena filed an Emergency Motion for Release Pursuant to 18 U.S.C. §3582(c)(1)(A)(i) (the "Motion"). Defendant asks the court to reduce his prison sentence and permit him to serve the equivalent time on Supervised Release in home confinement in view of the risk posed to him by the Coronavirus Disease 2019 ("COVID-19") pandemic, primarily because he is 70-years old. Pena was, as ordered by the court, tested on May 15, 2020 for the virus and the result was negative. The court finds that

defendant has proven he should be released now to home confinement.

Because Pena has appealed his sentence, and that appeal is pending, the court does not have jurisdiction to grant the Motion without a remand from the First Circuit. Therefore, Pena has also filed a Motion for an Indicative Ruling under Federal Rule of Criminal Procedure 37(a)(3), asking that the court state that it would grant the Motion and request that the First Circuit remand the case for that purpose. See Dkt. No. 173. The court is allowing the Motion for an Indicative Ruling.

If and when the First Circuit remands, the court will order that Pena be tested again. If Pena again tests negative, the court will grant his Motion, reduce his sentence to time-served, and order his immediate release to home confinement to serve the remainder of the equivalent of his sentence. More specifically, the court will order Pena to serve 36 months of Supervised Release, with the remainder of the 32-month prison sentence imposed to be served in home confinement as a condition of Supervised Release. Pena will, therefore, be in home confinement until January 26, 2022. As conditions of Supervised Release, Pena will be subject to electronic monitoring. He will be allowed to leave his home only for medical appointments approved by Probation, for medical emergencies reported to Probation within 24 hours, and to participate in religious observances if

2

pre-approved by Probation, which Probation would not be authorized to allow if the United States or the government of Massachusetts is recommending against congregate religious observances. In addition, the court will continue the conditions of Supervised Release originally imposed, including the requirement that Pena pay $2,500,000 in restitution.

## II.  PROCEDURAL HISTORY

On April 23, 2019, Pena was sentenced to serve 32 months in prison for defrauding the United States of $2,500,000, to be followed by two years of Supervised Release. Dkt. No. 147. The court also ordered restitution in the amount of $2,500,000. Id. Pena has appealed the sentence, and that appeal is pending in the First Circuit. See Dkt. Nos. 149, 151.

Pena began serving his sentence at the satellite camp at the Federal Medical Center Devens ("FMC Devens") on October 20, 2019. See Dkt. No. 161, 171-1. Ordinarily, Pena would complete his term in custody on January 26, 2022. See Pena Decl. ¶4 (Dkt. No. 171-1).

On April 8, 2020, Pena filed a request with the Bureau of Prisons that it transfer him to home confinement, or that it file a motion requesting that the court reduce his sentence pursuant to 18 U.S.C. §3582(c)(1)(A)(i) (the "compassionate release statute"), in view of the COVID-19 pandemic and his age, 70. See Dkt. No. 171-2. The Warden of FMC Devens, Stephen

Spaulding (the "Warden"), denied Pena's request on April 22, 2020. See Dkt. No. 175-1. Pena filed the Motion on April 21, 2020. See Dkt. No. 171. He asks the court to reduce his prison sentence and permit him to serve the equivalent time in home confinement.

Because the appeal of Pena's sentence is pending in the First Circuit, the court does not now have jurisdiction to grant the Motion. Therefore, Pena also filed a Motion for an Indicative Ruling under Federal Rule of Criminal Procedure 37(a)(3), asking that the court state that it would grant the Motion and requesting that the First Circuit remand the case for that purpose. See Dkt. No. 173.

The court conducted hearings on the Motion on May 6 and 13, 2020. Warden Spaulding testified at the May 13, 2020 hearing.

III. LEGAL STANDARD

Prior to the enactment of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), a court had the authority to order the compassionate release of a prisoner only if the Bureau of Prisons filed a motion requesting a reduction in sentence. The United States Sentencing Commission had found, based on reports from the Office of the Inspector General of the Department of Justice, among other things, that the Bureau of Prisons had been too restrictive in making compassionate release motions. See United States v. DiMasi, 220

F. Supp. 3d 173, 181-82 (D. Mass. 2016); Department of Justice, Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program, at 11 (April 2013); Department of Justice, Office of the Inspector General, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons, at 51 (May 2015). Therefore, in 2016, the Sentencing Commission revised U.S.S.G. §1B1.13 to encourage the Bureau of Prisons to file motions for compassionate release more frequently. This was in part because the Sentencing Commission found that, while only the Director of the Bureau of Prisons had the statutory authority to file a motion for compassionate release, the court is in a unique position to assess whether extraordinary and compelling circumstances exist and whether a reduction is warranted and, if so, the amount of the reduction. See 81 Fed. Reg. 27,261, at 27,264 (May 5, 2016); DiMasi, 220 F. Supp. 3d at 181-82.

In essence, the Sentencing Commission encouraged the Bureau of Prisons to be more liberal in creating opportunities for judges to consider whether compassionate release is justified, and reminded judges of their statutory obligation to consider the 18 U.S.C. §3553(a) factors and the Commission's guidance in making such decisions. DiMasi, 220 F. Supp. 3d at 182.

In December 2018, the First Step Act modified the compassionate release statute to authorize a prisoner to file a

5

motion for a reduction of sentence if the Bureau of Prisons has not granted his request to do so within a certain period of time. The compassionate release statute, 18 U.S.C. §3582(c)(1)(A)(i), now states in pertinent part that:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that --
>
> (i) extraordinary and compelling reasons warrant such a reduction; . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

IV. THE FACTS

President Donald J. Trump has declared a national emergency due to the COVID-19 pandemic. Because there is no vaccine to prevent COVID-19 and because COVID-19 may be spread by infected but asymptomatic individuals, the Centers for Disease Control and Prevention (the "CDC") has advised members of the public to wash their hands often, avoid close contact -- i.e., being within less than six feet of other people ("social distancing") -- wear a face covering when around others, and regularly clean and disinfect frequently touched surfaces. See CDC, Coronavirus

Disease 2019 (COVID-19): Protect Yourself, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html. The CDC has also advised that these measures are particularly important for individuals over 65-years old because they, among other groups, are at higher risk for developing more serious complications from COVID-19, including death. See CDC, Coronavirus Disease 2019 (COVID-19): Protect Yourself, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

The CDC's view is supported by data from throughout the United States and in Massachusetts. As of May 12, 2020, the CDC reported that of the 37,300 deaths in the nation attributed to COVID-19 for which it had information concerning the decedent's age, 29,655 (79.5%) were individuals aged 65 or older. In Massachusetts, as of May 12, 2020, 4,357, or 85.3%, of the 5,108 deaths attributed to COVID-19, were people aged 70 or older. See Dkt. No. 196, ¶¶1, 2. The CDC estimates that, if infected, a person between 65 and 84-years old faces a 31 to 59% chance of hospitalization, an 11 to 31% chance of admission to an intensive care unit, and a 4 to 11% chance of dying. See Dkt. No. 171, at n.7.

According to the Massachusetts Department of Public Health, almost all of the individuals who have died from COVID-19 in Massachusetts had some preexisting condition. See Mass. Dep't of

Pub. Health COVID-19 Dashboard, at 13 (May 12, 2020), https://www.mass.gov/doc/covid-19-dashboard-may-12-2020/download. The CDC defines severe obesity as a condition that puts a person at higher risk of severe illness from COVID-19. Severe obesity is defined as having a body mass index ("BMI") of 40 kg/m$^2$ or higher.

Pena is 70-years old. He is 6'2" tall. When he began serving his sentence in October 2019, he weighed 297 pounds and had a BMI of 37.2 kg/m$^2$. See Dkt. No. 189-2 (sealed medical records). In an April 21, 2020 declaration under oath in support of the Motion, Pena stated that when last weighed, "I was 307 pounds." Dkt. No. 170-1. If that were true, his BMI would have been above 39 kg/m$^2$, on the cusp of severe obesity. However, the court finds that Pena's statement that when he was last weighed he was 307 pounds was false. Pena's medical records show that on March 24, 2020, he weighed 243 pounds. Id. On that date, Pena, according to the medical records, reported that he had been exercising to lose weight. Id. The court finds that Pena knew he had not recently weighed 307 pounds.

In view of the statistics cited earlier, Pena is at significant risk of suffering severely if infected by the COVID-19 virus by virtue of being age 70 alone. His false statement concerning his weight contributes to the court's decision that his home confinement should be on electronic monitoring.

8

However, it does not alter the conclusion that a reduction of his sentence is justified.

The court finds that there is a significant risk that the COVID-19 virus will get into the FMC Devens Camp in which Pena is held. On May 13, 2020, the Warden of FMC Devens provided lengthy, candid, and informative testimony. The court finds that he has been making his best efforts to keep inmates at the medical facility and at the Camp at FMC Devens from becoming infected by, among other things, modifying its operations plan, issuing face coverings to staff and inmates, screening staff and newly admitted inmates for the disease, suspending in-person visitation, and minimizing the number of staff who work both at the medical center and the satellite Camp at FMC Devens. See April 24, 2020 Bourke Decl. ¶21 (Dkt. No. 175-3); May 13, 2020 Tr. 44:11-45:6 (Dkt. No. 206) (testimony of Warden). Nevertheless, as of May 13, 2020, eight inmates and two staff at the medical facility have tested positive for the COVID-19 virus. See Dkt. No. 204 (citing Bureau of Prisons' website). The Warden agrees that, although he has been aggressive in his efforts to protect inmates at the Camp, he has been "lucky" that none have been infected yet. May 13, 2020 Tr. 90:15-20 (Dkt. No. 206).

Some staff work in both the medical facility and the Camp. The CDC has advised that asymptomatic individuals may be

infected and spread the virus. See Savino v. Souza, C.A. No. 20-10617-WGY, Dkt. No. 175 (D. Mass. May 12, 2020), at 15. However, the Warden does not have the resources to test staff members who do not have a fever or other symptoms of COVID-19 infection. The Camp at FMC Devens does not conduct such testing. Nor does FMC Devens do any contact tracing of staff members to determine whether they have interacted with an infected individual in the community. The CDC, however, has stated that such tracings should be a priority for congregate living settings such as prisons and camps.

Therefore, the court finds that it is probable that, despite the Warden's best efforts with the limited resources available, his good luck will not continue and an inmate at the Camp will become infected. If and when that occurs, there is significant potential that the virus will spread at the Camp, as the CDC has recognized is a significant risk in prisons and jails generally. See Savino, supra, at 21.

Social distancing is not possible to maintain at all times in the Camp at FMC Devens. For example, inmates in the Camp sleep in bunk beds and small cubicles without ceilings. Pena does not share his cubicle. However, most cubicles have two inmates. There is only a thin wall between the cubicles. Inmates are not six-feet apart when they sleep, for example. In addition, they must share bathrooms and other facilities.

Therefore, the risk of any infection at the Camp spreading is high.

The Warden testified that he did not consider the merits of Pena's request for home confinement or the merits of his request that the Bureau of Prisons file a motion for compassionate release because, under Bureau of Prisons' policy, defendant has not served a sufficient percentage of his sentence. Pena will become eligible for consideration for home confinement under the Bureau of Prisons' policies in July 2020. The Warden testified that based on the criteria in two memoranda from Attorney General William Barr, if Pena were now eligible, the Warden would recommend to his superiors that Pena be transferred to home confinement. He expects that Pena's request for release would be granted.

V.   HOME CONFINEMENT AND THE BUREAU OF PRISONS' POLICIES

The court would not be required to consider Pena's motion for compassionate release if the Bureau of Prisons had granted his request to serve the remainder of his 32-month sentence in home confinement. Prior to the pandemic, 18 U.S.C. §3624(c)(2) only permitted the Bureau of Prisons to transfer a prisoner to home confinement for the shorter of 10 percent of his term of imprisonment or six months. Therefore, ordinarily, Pena would not have been eligible for a transfer to home confinement until October 22, 2021.

The case management coordinator at FMC Devens, Amber Bourke, asserted in a declaration that Pena is ineligible for consideration for home confinement until that date. See Dkt. No. 189-1, ¶25. That is incorrect. Section 3624(c)(2) was amended by the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020). Section 12003(b)(2) of the CARES Act permits the Attorney General to broaden the scope of inmates who may be considered for home confinement if the Attorney General finds that COVID-19 is materially affecting the Bureau of Prisons' operations. Attorney General William Barr made that finding on April 3, 2020. See Mem. from W.P. Barr to M. Carvajal, at 1-2 (Apr. 3, 2020) (Dkt. No. 197-2). He then instructed the Bureau of Prisons to expand the review for transfers to home confinement to include all at-risk inmates, not only those who were previously eligible for transfer. See id. at 2.

In a March 26, 2020 memorandum, the Attorney General directed the Bureau of Prisons to prioritize the use of transfers to home confinement for inmates making requests based on the pandemic. Mem. from W.P. Barr to M. Carvajal, at 1-2 (Mar. 26, 2020) (Dkt. No. 197-1)). He stated that decisions should be guided by the factors described in that memorandum. Id. In his April 3, 2020 memorandum, the Attorney General wrote that inmates with a suitable confinement plan would generally be

appropriate candidates for home confinement, rather than continued detention at institutions in which COVID-19 is materially affecting operations. Id. In addition, the Attorney General stated that determinations should be "individualized." Id. at 3.

In his March 26, 2020 memorandum, the Attorney General wrote that decisions concerning transfers to home confinement should be made based on the totality of the circumstances. He provided the following non-exhaustive list of discretionary factors to be considered:

1.  The age and vulnerability of the inmate to COVID-19 in accordance with CDC guidelines;

2.  The security level of the facility currently holding the inmate, with priority given to inmates residing in low- and minimum-security facilities;

3.  The inmate's conduct in prison;

4.  The inmate's score under a series of factors called PATTERN, which measures the risk of recidivism;

5.  Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her Bureau of Prisons facility; and

6.  The inmate's crime of conviction and assessment of the danger posed by the inmate to the community. (Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh

more heavily against consideration for home
confinement.)

Mem. from W.P. Barr to M. Carvajal, at 1-2 (Mar. 26, 2020) (Dkt.
No. 197-1).

Despite these directions from the Attorney General, the
Warden did not consider whether Pena satisfied these criteria
and, therefore, should be allowed to serve the remainder of his
sentence in home confinement. He did not do so because the
Bureau of Prisons has directed its wardens not to evaluate
inmates for release under the Attorney General's criteria unless
they have served 50 percent or more of their sentence, or have
served 25 percent or more of their sentence and have 18 months
or less to serve. See Mem. from A. Matevousian & H.J. Hurwitz to
Bur. of Prisons Chief Exec. Officers, at 2-3 of 4 (May 8, 2020)
(Dkt. No. 197-3). The Warden testified that an exception to
these eligibility requirements can be made only if the Bureau of
Prisons headquarters in Washington, D.C., orders a warden to
evaluate for home confinement an inmate who has not served a
sufficient percentage of his sentence.

Although the Warden did not know it when he was testifying
on May 13, 2020, about the Bureau of Prisons' policy and
practices, such a request for an evaluation was evidently made
by Bureau of Prisons headquarters concerning Paul Manafort, a
71-year-old inmate who had served only 23 months of a 77-month

14

sentence, and who was released to home confinement that day. See Assoc. Press, "Paul Manafort Released from Federal Prison to Home Confinement over Coronavirus Concerns," Boston Globe (May 13, 2020).

Pena will have served 25 percent of his sentence and have 18 months remaining in July 2020, two months from now. The Warden testified that, in view of the criteria in the Attorney General's March 26 and April 3, 2020 memoranda, he would then recommend Pena's release to home confinement. More specifically, the Warden stated that he would deem Pena to be an at-risk inmate based on his age, 70, alone. The Warden does not view Pena as otherwise vulnerable under the CDC guidelines. Pena is held in a minimum-security facility. The Warden testified that Pena's conduct has been exemplary. Pena's PATTERN score indicates he presents a minimum risk of recidivism. In addition, he has an appropriate plan if released, i.e., to live with his wife in their single-family home in Falmouth, Massachusetts. In addition, in the Warden's view, Pena would not pose a danger to the community. The Warden also implicitly indicated that Pena would be at a lower risk of contracting the COVID-19 virus at home than at FMC Devens when he found that Pena's release plan was adequate. However, as indicated earlier, the Warden did not do this analysis when he received Pena's request to be

transferred to home confinement because Pena had not served at least 25 percent of his sentence.

Nor did the Warden consider whether there were extraordinary and compelling reasons to file a motion, pursuant to 18 U.S.C. §3582(c)(1)(A)(i), requesting that the court allow Pena to serve the remainder of his sentence in home confinement when the Warden denied Pena's request for such a motion on April 20, 2020. The Warden did not do so because, on January 17, 2019, in response to the First Step Act amendment to 18 U.S.C. §3582(c), the Bureau of Prisons issued a program statement concerning compassionate release motions. See Department of Justice, Bureau of Prisons, Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§3582 and 4205(g) (Jan. 17, 2019). In that program statement, the Bureau of Prisons set forth its criteria for filing a motion to reduce sentence for an elderly inmate. The wardens were directed to file such motions only, as pertinent here, if the inmate was 70-years old and had served 30 years or more, or the inmate was 65 and had a serious medical condition and had served 50 percent of his sentence, or the inmate was 65 and served the greater of ten years or 75 percent of his sentence. Id.

These restrictions appear to this court to be a continuation of the restrictive policies and practices of the

Bureau of Prisons that prompted, first, the revision of the Sentencing Guidelines in 2016, and then the First Step Act amendment in 2018 permitting prisoners to file Section 3582(c)(1)(A)(i) motions themselves. Among other things, the Bureau of Prisons Program Statement 5050.50 does not recognize or discuss the fact that the First Step Act added the provision that a motion to reduce sentence could be justified by the extraordinary and compelling reasons on which Pena relies now.

In any event, the Warden did not consider the COVID-19 pandemic or anything specific to Pena other than how much of his sentence he had served when the Warden denied Pena's request that the Bureau of Prisons file a motion for reduction of his sentence. Rather, solely because Pena had not served as long as required by the Bureau of Prisons' program statement, the Warden denied Pena's request for a motion for compassionate release.

As discussed earlier, Pena will become eligible for consideration for home confinement under the Bureau of Prisons' policies in July 2020. Based on the criteria in the memoranda from Attorney General Barr, if Pena were now eligible, the Warden would recommend that Pena be released to home confinement. The Warden expects that request would be granted. The court agrees that release to home confinement would be justified and appropriate.

Therefore, as a practical matter, the issue for the court now is whether Pena should be required to remain at FMC Devens until July 2020, risk being infected by the COVID-19 virus, and, if infected, face the high risk of hospitalization and possibly death. When the court asked the Warden why it should not now reduce Pena's sentence to avert the risk that he will be infected in the two months before July 2020, the Warden responded, "[t]hat's a great question." May 13, 2020 Tr. 91:15 (Dkt. No. 206).

## VI.   THE MERITS OF THE MOTION FOR COMPASSIONATE RELEASE

As Pena made his request to the Warden on April 8, 2020, the parties agreed at the May 6, 2020 hearing that the 30-day exhaustion requirement is not an impediment to the court's deciding the pending merits of the Motion. The court concurs.

The court finds that there are extraordinary and compelling reasons that justify reducing Pena's sentence to time-served and increasing his term of Supervised Release from two to three years. As part of this, it is most appropriate to require as a condition of Supervised Release, that Pena be confined to his home until January 26, 2022, with electronic monitoring.

As the President and Attorney General, among many others, have recognized, the virtually unprecedented COVID-19 pandemic is extraordinary. It has created unforeseen and extreme risk to the health of inmates generally, and particularly to those who

18

are 65 and older. With regard to Pena, there are significant risks that staff at the FMC Devens Camp will become infected, that the infection will spread to inmates, and that, if Pena becomes infected, he will by virtue of his age alone face a significant risk of being hospitalized and also a risk of dying.

The court finds that the 18 U.S.C. §3553(a) factors weigh in favor of allowing Pena to, in effect, serve the remainder of his sentence in home confinement. As the court said in sentencing Pena in 2019, he committed a serious fraud, over a long period of time, that caused the United States a $2,500,000 loss. However, as the court also said at Pena's sentencing, he was in many other respects a good person, including a faithful father, a devoted husband, a very good friend, and a contributor to his community. That is why the court imposed only a 32-month sentence, which was below the Guidelines range. See Sentencing Tr. 37:19-40:9 (Dkt. No. 163).

Pena has tested negative for the virus. If he does so again before being released, he will not be a danger to the health of the community. The court found at his sentencing that a prison sentence was not necessary to deter Pena from committing more crimes and thus to protect the public. The court believed in 2019 that Pena had learned his lesson. His false statement about his weight causes the court some concern about that conclusion.

However, the court continues to believe that Pena will not commit crimes if released.

In all white-collar cases, the interest of general deterrence is important. As trillions of dollars are being made available quickly by the government as a result of the pandemic, general deterrence is now an especially important consideration. However, in view of the danger of being in prison created by the COVID-19 virus, the seven months Pena has served should be sufficient to send the message that it would be a miscalculation, potentially a fatal miscalculation, for anyone to defraud the United States now.

The court has considered whether ordering Pena's release might result in unjustified disparity, particularly regarding others who are 70 or older at the FMC Devens Camp. However, as of May 8, 2020, there were only eight inmates 70 or older at the Camp. On May 11, 2020, one of them, John DiMenna, was granted a reduction of sentence to home confinement by a court over the Bureau of Prisons' objections. See United States v. DiMenna, No. 3:17-cr-202 (VAB), Dkt. No. 71 (D. Conn. May 11, 2020). The Warden testified that two or three other inmates at the Camp over age 70 will be eligible and are scheduled to be released to home confinement before July 2020. Therefore, if Pena is released, there will be three others over 70 in the Camp. If they are similarly situated to Pena, the most appropriate way to

avoid unjustified disparity will be for the Bureau of Prisons to transfer them to home confinement or for a court to grant a motion for such relief.

Under §3553(a), the court must also consider whether allowing Pena to complete his sentence in home confinement will promote respect of the law. Fundamental to this is giving integrity to the bedrock principle of equal justice. As explained earlier, on May 13, 2020, the Warden testified that he denied Pena's request for home confinement solely because of the Bureau of Prisons' policy that made him ineligible for consideration because he had not served 25 percent of his sentence and was not within 18 months of the end of it. However, as the Warden was testifying, the Bureau of Prisons evidently ordered an exception to this requirement for President Trump's former campaign Chair, Paul Manafort, and transferred Manafort to home confinement although he had served only 23 months of a 77-month sentence. Every person and case is unique. Manafort may have health problems that placed him at particularly high risk. However, making an exception to the Bureau of Prisons' policy for Manafort, and refusing to consider Pena and other elderly inmates' requests for relief on their merits, will inevitably raise reasonable questions about whether justice is indeed blind and whether the administration of justice today deserves respect. The court hopes that granting Pena the reduction in

sentence and release to home confinement that is otherwise justified will, in a small way, counter those concerns.

Granting Pena's Motion will also be consistent with the relevant policy statements of the Sentencing Commission. Using the same language as 18 U.S.C. §3582(c)(1)(A)(i), Sentencing Guideline §1B1.13(1)(a) states that courts should consider the §3553(a) factors and may reduce a sentence if "extraordinary and compelling reasons warrant the reduction." The Guidelines were last amended on November 1, 2018, a month before the First Step Act amended §3582(c)(1)(A)(i), removing the requirement that the Bureau of Prisons file the motion for reduction in sentence. The Sentencing Commission has not amended the Guidelines since November 1, 2018, evidently because it does not have sufficient members to take official action. In any event, the Guidelines are out of date. For example, Application Note 4 still states that a reduction in sentence may be granted only upon a motion by the Bureau of Prisons. This is not true after the First Step Act. Application Note 1(D), which also requires a determination by the Bureau of Prisons that extraordinary and compelling circumstances exist before a court can act, is similarly vestigial and inoperative. See, e.g., United States v. Lisi, No.

15 Cr. 457 (KPF), 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020) (collecting cases).[1]

Where, as here, the Bureau of Prisons has not considered the existence of the COVID-19 pandemic, the §3553(a) factors, or anything other than the amount of time Pena has served, it would be especially inappropriate to deny Pena's motion for compassionate release because the Bureau of Prisons has not filed its own motion. More instructive is the fact that the Warden would in July 2020 recommend Pena for home confinement based on the facts that exist today, and there are compelling reasons not to perpetuate the significant risk to Pena if he becomes infected.

---

[1]   As the court has previously noted:

All provisions of the Sentencing Guidelines have been advisory since 2005, when the Supreme Court decided United States v. Booker, 543 U.S. 220 (2005). Policy Statements such as U.S.S.G. §1B1.13 that do not interpret a specific Guideline were advisory even before Booker. See United States v. O'Neil, 11 F.3d 292, 302 n.11 (1st Cir. 1993). Moreover, the language in [the] Application Note[s] . . . is not [all] in §1B1.13 itself. For these reasons, while §1B1.13 and [the] Application Note[s] provide a framework for determining the merit of [a] [m]otion [for compassionate release], it is not required that each of the Application Note criteria be satisfied to find that a motion for compassionate release should be granted. Rather, 18 U.S.C. §3582(c)(1)(A) requires only that the court determine whether a reduction in sentence is 'consistent with' the §1B1.13 Policy Statement.

DiMasi, 220 F. Supp. 3d at 192-93 n.13.

Therefore, the court is allowing Pena's Motion for an Indicative Ruling (Dkt. No. 173). The court is requesting that the First Circuit remand the case to this court. The court will then order that Pena be tested again. If he again tests negative, the court will order his immediate release. The court does not intend to order that Pena be quarantined for 14 days at FMC Devens, as required by the usual Bureau of Prisons practice. Quarantine would require Pena to stay in solitary confinement for 14 more days, which would be more punitive than helpful, as it would continue to put Pena at risk of being infected by staff or other inmates.

In addition, the court is increasing Pena's term of Supervised Release from two years to three years, to be served until January 26, 2022 on the special condition that he be confined to his home. See 18 U.S.C. §3582(c)(1)(A). As indicated earlier, Pena's false statement regarding his weight influences the court to conclude that his home confinement should be subject to electronic monitoring. The court has been ordering that only rarely during the pandemic because it requires some physical interaction between the Probation Office and the defendant. However, the court does find that is necessary in this case and that the risk to the Probation officer should be minimized because, if released, Pena will have twice tested negative for the COVID-19 virus.

24

Pena will be allowed to leave home only with the prior permission of Probation for medical appointments. If he suffers a medical emergency, he will not be required to get approval in advance to leave home, but he will have to report the emergency to Probation within 24 hours. Pena will also be permitted to leave for religious observances with the prior permission of Probation. This will be allowed only if religious institutions, such as churches, have been reopened.

The existing conditions of Supervised Release will also continue. See Judg. 4-6 of 12 (Dkt. No. 147). Among other things, Pena is again being ordered to pay restitution in the amount of $2,500,000, and must provide Probation with any requested financial information. The United States Attorney's Office may make requests for information to Probation. Probation shall communicate those requests to Pena, or, if it believes that the requests may be unreasonable, seek guidance from the court. Probation shall also propose to the court for approval a plan for the payment of restitution.

VII. ORDER

In view of the foregoing, as previously ordered on May 15, 2020, it is hereby ORDERED that:

1.   Pena's Motion for an Indicative Ruling (Dkt. No. 173) is ALLOWED. The court finds that defendant's Emergency Motion for Compassionate Release under 18 U.S.C. §3582(c)(1)(A)(i)

(Dkt. No. 171) raises a substantial issue and that, if the Court of Appeals for the First Circuit remands for the purpose of ruling on the Motion, and Pena again tests negative for the COVID-19 virus, the court will allow the Motion and re-sentence defendant as follows:

a. The court will modify defendant's sentence of imprisonment to time-served;

b. The court will increase defendant's term of Supervised Release to three years, on the mandatory, standard, and special conditions imposed at sentencing on April 23, 2019, and, until January 26, 2022, on the following special condition:

Defendant shall be restricted to his residence in Falmouth, Massachusetts, subject to electronic monitoring, except for medical appointments approved in advance by Probation; any medical emergency, provided he report it to Probation within 24 hours; religious observances approved in advance by Probation; and court appearances or other activities approved by the court; and

c. The remainder of defendant's sentence shall otherwise be unchanged and remain in effect.

2.    Defendant shall promptly notify the clerk of the Court of Appeals of this ruling and Order. <u>See</u> Fed. R. Crim. P. 37(b); Fed. R. App. P. 12.1.[2]

UNITED STATES DISTRICT JUDGE

---

[2]    On May 18, 2020, the Court of Appeals for the First Circuit remanded this case to the court. Dkt. No. 216. Pena again tested negative for the COVID-19 virus. Therefore, his motion for compassionate release was granted. Dkt. No. 220. Pena was released on May 19, 2020.